Filed 12/27/13

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037745 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS038586A) |
| v. | |
| RAMON ESPARZA RIOS, | |
| Defendant and Appellant. | |

Defendant was charged with murdering Concepcion Esparza (Concepcion) (count one), Jose Luis Parra Hernandez (Hernandez) (count two), and Luis Orlando Esparza (Orlando) (count three). Following a trial, a jury found defendant Ramon Rios guilty of three counts of first degree murder (Pen. Code, § 187, subd. (a)).[1] It further found that defendant personally used a firearm, namely a nine millimeter pistol, in committing those murders within the meaning of section 12022.5, subdivision (a). It also found true that defendant committed multiple murders within the meaning of section 190.2, subdivision (a)(3), a special circumstance making death or imprisonment in the state prison for life without the possibility of parole the penalty for first degree murder. The trial court

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IIA, IIB1, IIB2, IIC, and III.

[1] All further statutory references are to the Penal Code unless otherwise specified.

1

sentenced him to three consecutive prison terms, each consisting of life without the possibility of parole plus a four-year firearm enhancement (§ 12022.5, subd. (a)).

On appeal, defendant raises multiple contentions. We find no reversible error and affirm.

I

*Evidence*

A. *Prosecution's Case in Chief*

*Background*

On the evening of January 6, 1990, defendant Ramon Rios shot his son Orlando, his wife Concepcion, and Concepcion's cousin, Hernandez, in the trailer where defendant lived with his family. At the time of the shootings, defendant's daughter Lorena Esparza (Lorena) was about 18 years old and in high school, his son Juan Esparza (Juan) was 17 years old, his son Orlando was 12 years old, and his son Jose Ramon Esparza, Jr. (Ramon) was 11 years old. The next youngest was his daughter named Esmeralda, who was about six years old, and his very youngest was his son Miguel, who was three or four years old.

The trailer was located on Silva Ranch off Bitter Water Road in King City. Defendant worked at the ranch as a foreman. Juan also worked on the ranch and helped defendant with irrigation. Defendant carried a gun as part of his job.

Juan and Ramon indicated that Concepcion had drinking problems. Defendant also drank. According to Ramon, defendant and Concepcion fought about her drinking. Lorena said that defendant did not like Concepcion to drink because she became aggressive and provocative. Lorena characterized their relationship as unhappy.

*Earlier in the Day*

Earlier on the day of the shootings, Rosa Hernandez (Rosa), Hernandez's mother, had been visiting at the trailer and she had helped prepare dinner. Concepcion had driven

2

Rosa back to her house in King City and later returned to the trailer with Hernandez. At trial, Ramon remembered being at his great aunt's house and seeing his mother drinking there. At trial, Juan testified that they saw Hernandez about once a year; he thought that Hernandez lived in Mexico.

On the evening of the shootings, Concepcion and Hernandez were drinking in the trailer. Lorena testified at trial that she was concerned that the presence of Hernandez and their drinking would provoke defendant.

*The Shootings*

Defendant came home sometime after 9 o'clock in the evening. Everything sounded pleasant at first but then Lorena, who was in her room that she shared with her sister Esmeralda, heard her parents arguing. Juan, who was in his room, also heard the talking turn into arguing. Juan's room was the converted laundry room across the hall from Lorena and Esmeralda's bedroom and Orlando and Ramon's bedroom.

After the shootings, Lorena told Ronald Qualls, a detective in the Monterey County Sheriff's Department, that her parents had been arguing about a relative. Juan told Gary Craft, an investigator with the Monterey County Sheriff's Department, that they had been talking about something related to the family. Ramon testified at trial that he thought his parents were arguing about his mother's drinking.

The arguing escalated and Lorena heard sounds of someone being slapped. After the shootings, Lorena told Detective Qualls that she could hear defendant yelling and things moving and someone falling.

In a follow-up interview on January 8, 1990, Lorena told Gary Craft, then an investigator with the Monterey County Sheriff's Department, that she heard Hernandez tell defendant to be quiet or calm down. Juan told Investigator Craft that he heard the sound of his father grabbing his mother. Juan said that he heard defendant say, "Grab

3

something to kill me" and "Here's a potato peeler.  Do it with this."  Juan said that defendant then came to his door and showed him a cut.

At trial in 2011, Lorena testified that she heard defendant banging on Juan's door and telling him to come out and look at their mother.  Juan testified at trial that defendant came into his room, showed his finger to Juan, and said, "Look, she cut my finger."  Defendant left and Juan shut his door.  Juan heard more arguing and angry talking.

Lorena came out of her room and into the hallway.  Defendant was holding a gun in his hand, the barrel up in the air.  He said, "Look at your mother," which Lorena understood to be a reference to her mother's intoxicated state.  Lorena told defendant to calm down or knock it off.  She suggested that he leave.  She went back to her room.

Ramon later told Investigator Craft that he had been awakened by his parents arguing and yelling.  At trial, he testified that Orlando and he were watching TV in their bedroom and could hear the arguing.  Ramon heard things being thrown in the dining room.  The trailer was shaking.

Back in her bedroom, Lorena heard more arguing and then one or two gunshots and then a thump.

In his room, Ramon heard gunshots; a bullet came through the wall into his bedroom; Orlando fell from the bottom bunk bed onto the floor.  Ramon saw blood coming from Orlando's head, he thought his brother was dead, and he screamed.  Defendant came running to his room.  At trial, Ramon testified that defendant had a gun in his hand.

Lorena heard defendant calling out to Orlando in an anguished voice; she was scared and stayed in her room.  She heard defendant say, "Now you're happy.  Look what you've done now."  She heard defendant say "something about your fault."  Defendant was speaking in Spanish using the feminine form.  Then she heard more gunshots; she believed a bullet came through her wall after the initial shots.

4

Ramon later told Investigator Craft that he had heard Hernandez say at some point, "What did I ever do to deserve this?"

Lorena and Esmeralda got up but Lorena pushed her sister back and she walked toward the door. Lorena heard defendant yelling, "My son. What have I done to him? I killed him." Lorena went out of her room.

Defendant was saying that he shot or killed his son. Defendant seemed unsure whether to leave; Lorena recalled seeing defendant "turn around and look at [her] and then turn around to leave but then turn around" again. Defendant was crying and yelling in anguish as he went back and forth. Ramon saw defendant pass by in the hall and this was the last time he saw defendant.

Ramon told Lorena that Orlando was dead. Juan, who had heard about five to six shots, came out of his room and Lorena told him that Orlando had been shot. Juan saw defendant at the sliding door across from the dining table.

Lorena told Detective Qualls that defendant went out the door very fast. Lorena testified that, before he left, she had been thinking, "[G]o before they come." "But then when he shut the door, [she] wanted to tell him to stay."

After the shootings, Lorena told Detective Qualls that she had heard the defendant's truck starting and then being driven quickly away. Ramon told Investigator Craft that he had heard defendant driving away.

Lorena went into her brothers' room and saw that her brother had been shot. Lorena's little siblings told her that defendant had also shot their mother and Hernandez. Lorena went to her mother, kneeled and looked at Concepcion. She heard a gurgling sound.

Meanwhile, Juan went into Orlando's room and saw blood coming from Orlando's head. Ramon was sitting against the bunk bed. Juan picked up Orlando from the floor

5

and lay him on the other bed in the room. At trial, Juan testified that he believed that Orlando was defendant's favorite son.

Lorena went back to Orlando. At this point, defendant was already gone. Orlando had been moved to the bed and Lorena stayed with him on the bed.

After defendant left, Juan saw both his mother Concepcion and Hernandez lying face down on the floor. His mother was near the corner of the dining table. Juan turned his mother towards him and saw blood; she was breathing but appeared unconscious. She had no weapon. Juan held his mother in his arms until she died.

The trailer had no telephone. Juan went to the office outside the trailer and called 911.

Ramon testified that, after defendant had left, Ramon saw his mother and Hernandez. Hernandez was gasping for air.

*The Crime Scene Investigation and Autopsy*

Sheriff's Deputy Gary Wheelus was dispatched to the scene at about 11:13 p.m. on January 6, 1990. He arrived at about 11:30 p.m. and he was one of the first officers to arrive. Upon entering the trailer, he saw two people with obvious gunshot wounds. He did not notice any weapons near either of the victims. Deputy Wheelus found a boy, who had been shot, moaning and whimpering in the first bedroom down the hallway on the left. The boy was taken to Mee Memorial and later pronounced dead.

Wayne Harvey, a detective with the Monterey County Sheriff's Department, arrived at the scene at about 1:00 a.m. on January 7, 1990. At trial, Detective Harvey did not recall seeing any weapons in the possession of, or near, the adult shooting victims.

Seven Budweiser beer cans were on the dining table; there was a blood stain smear on the tablecloth. A metal potato peeler was found on top of the kitchen counter. The parties stipulated that the peeler tested positive for human blood in 1990 but no DNA

6

typing was done. There were also blood splatters on the counter in the vicinity of the peeler.

Concepcion was found lying on the floor, not far from a hole in the dining table. A bullet had entered through the top of the table and exited the table's edge, passing through the clear plastic covering the tablecloth and the tablecloth. Blood had dripped down and dried on the plastic. Concepcion was wearing a red and black plaid jacket. An unexpended nine millimeter bullet was found by her left foot. The live round was significant to Investigator Craft because it could indicate that "the gun was being locked and loaded" and caused the gun to kick out a live round that had been already loaded.

Hernandez was found lying on the floor near one end of the table.

John Randall Hain, a forensic pathologist, testified that he performed autopsies on the three victims on January 7, 1990, the day after the shootings. He saw no evidence that any of the victims was shot from close range.

Orlando had an entrance gunshot wound on the right center back of the top of the head and an exit hole in his scalp in the left center front of the top of his skull. This wound was fatal. Orlando also had a small abrasion, which looked like a wound caused by a gunshot graze, on the inner right foot immediately below the ankle.

Concepcion had four separate gunshot wounds. A bullet had entered her right temple and exited in the area of the left upper cheek. There was a wound caused by gunshot graze "on the inner aspect of the back of the right upper arm." A bullet had entered her right lateral breast area, penetrated the breast, and exited "the inner aspect of the right breast somewhat lower." A fourth wound was caused by a bullet that entered her left forearm and exited the inner side of her wrist. The entry hole had "a very wide marginal abrasion, indicating the bullet was tumbling," which "means it likely went through something else first."

7

Dr. Hain thought there was a minimum of two different bullets. The wounds to her arm, breast, and wrist could have been caused by the same bullet and they were not fatal. According to Dr. Hain, the wound to her head was "rapidly fatal." It would have caused her to change position immediately, i.e. collapse and lose consciousness, which made him "lean to the probability" that the head shot occurred second.

Dr. Hain did not identify any bruising on Concepcion attributed to a beating.

Detective Qualls, who attended the autopsy performed by Dr. Hain, testified that Concepcion's red and black plaid jacket had a bullet hole; wood splinters caught in the fabric matched the "splintering" found on the floor by the table.

Hernandez had two entry wounds and two exit wounds. One bullet entered Hernandez's upper left back in the upper shoulder blade area. It went through his left chest, perforated his upper left lung, and exited the left center of his upper chest. Another bullet entered his left flank, traveled through the center of his body, hit his aorta, the largest blood vessel in his body, and exited his right flank. After this wound, Hernandez would have collapsed after about 10 seconds and "bled out rapidly." But he could walk or crawl for about 10 seconds. Dr. Hain lacked sufficient information to form an opinion as to which injury occurred first.

The boys' bedroom adjoined the dining area; the bedroom contained a bunk bed and another bed with not much space between. A photograph of the crime scene showed some blood spattering on the lower bunk. There was also some blood spatter and a blood stain on the bed across from the bunk bed.

In the dining area, bullet holes indicated that one bullet had penetrated the top of a dining room cabinet, gone through the wall, and exited into the boys' adjoining bedroom. Another bullet had entered the same dining room wall higher up and exited into the boys' bedroom as well. There was also a bullet hole in the far wall of the boys' bedroom.

8

Using an antenna as a probe, investigators determined the two bullets' direction of travel. The lower bullet had passed through the dining room cabinet and traveled through the wall into the adjoining boys' bedroom; a spent bullet was located under the carpet in that bedroom. Investigator Craft believed that the trajectory of that bullet was consistent with a bullet striking Orlando's foot.

The upper bullet had traveled through that dining area wall into the adjoining boys' bedroom, passed through the bunk bed frame, and continued through the far wall into the girls' adjoining bedroom. A bullet was found in the girls' bedroom. In Investigator Craft's opinion, the path of that bullet was consistent with Ramon's testimony that Orlando was sitting on the bunk bed watching TV and Dr. Hain's testimony that a bullet traveled through Orlando's head.

Two bullet holes were found in the sliding glass door next to the dining area. A slug was found lodged in the lower-half of front door. Detective Harvey testified at trial that, based on its trajectory and where it lodged, it was his conclusion that the door was opened when the bullet was fired.

Six shell casings and a live bullet were recovered inside the house. Five shell casings were found outside the house but they were not all nine millimeter.

Three bullet casings were collected from the top of the dining table. Another casing was found on the seat of a chair near the cabinet and the table; two more casings were found nearby on the floor. One of the two bullet casings on the floor was found at the leg of a chair and the other was found closer to the entrance to the hallway. In Investigator Craft's opinion, the gun had to be in that room because it ejected or "kick[ed] out" the casings to the right and if defendant had been in the hallway, the casing would have kicked out in the hallway.

Investigator Craft believed the casings on the table may have reflected the shooting of Concepcion and the casings found on the floor may have reflected the

9

shooting of Hernandez.  It was his belief that one bullet went through the table and struck Concepcion's arm, breast, and then wrist.  In his opinion, those wounds and the splintering put her down at the level of the table. A likely scenario is that another bullet then struck her head, she dropped and the bullet ended up in the far door. The blood evidence for Concepcion was found near her body, which indicated that she was shot in that general area.  In his view, the physical evidence indicated that Concepcion was retreating; no shiny object was found close to her body.  The blood evidence for Hernandez was found near his body.

In Investigator Craft's opinion, six bullets were fired during the incident based on the number of shell casings that were found.  The bullets resulted in six bullet paths causing each of the three victims to sustain two sets of wounds.

Concepcion's blood alcohol level was .22, almost three times the legal limit to drive.  Hernandez's blood alcohol level was .07, just under the legal limit to drive.

*Defendant's Relationship with Concepcion and Prior Domestic Violence*

After the shootings, Investigator Craft learned from Lorena and Juan that their parents had been having problems for the past month or so.  Lorena also said that her parents had previously argued and fought. She indicated that she was familiar with her mother being slapped and beaten.  Juan was familiar with the sounds of his parents arguing and fighting. He said that defendant had previously hit his mother.

Ramon testified at trial that he had seen his parents arguing a lot and throwing stuff at each other and, although he had not seen defendant hitting his mother, he had seen bruises on his mother.  One of the main things they argued about was his mother's drinking.

At trial, Juan recalled his mother being taken to a hospital after an incident involving his father.  He remembered being taken to a shelter for abused women but he

10

did not know the reason why he was taken there.  He also remembered that his father had been in jail.

Defendant Rios and Concepcion had separated for a period.

Lorena testified that Concepcion could be provocative and defendant was always warning her to "shut up."  Concepcion sometimes tried to hit defendant too.  Concepcion had a bad temper.

*Defendant's Statements after Being Returned to the United States in 2010*

Martin Sanchez, an investigator with the Monterey County District Attorney's Office and a life-long and fluent Spanish speaker, took custody of defendant Rios from federal marshals on November 24, 2010 at the San Jose Airport.  Defendant had arrived on a flight from Mexico City.  The first interview, which occurred while they were driving from San Jose to the Monterey County jail, was not recorded.  Defendant had told Sanchez that he could not read or write.  Sanchez found that defendant had a good understanding of the case and a good recall.  Sanchez interviewed defendant Rios several times.

Defendant said that he had a Beretta nine millimeter automatic, which he had bought about 15 days before the shootings.  He stated that the gun held 15 bullets, 14 in the magazine and one on top in the chamber.  Defendant claimed that he always kept the safety on.  Defendant had two .22 rifles and an R14.  Defendant had started handling guns and rifles when he was about 12 years old.

On the day of the shootings, defendant Rios had been drinking after work and before going home.  Defendant and Adan Flores had shared a 24-pack and defendant may have drunk "a little more" than Flores.  According to defendant, he arrived home at about 6:30 in the evening with another 12-pack of beer and his Berretta.  The gun was loaded with one magazine and he had another magazine in his pickup truck.

11

Defendant told Investigator Sanchez that, although he rarely chambered a bullet on top, that day his gun had a bullet chambered on top and 14 bullets in the magazine. That meant that, aside from the safety, the gun was ready to fire. Rios told Sanchez that he did not know why he had the gun ready with a bullet on top that day.

When he arrived home, Concepcion and Hernandez were drinking beer and invited him to have a drink with them. He had a beer with them. He said that he did not recognize Hernandez. Defendant claimed not to have seen Hernandez since 1971 and it occurred to him that Hernandez was his wife's lover.

Defendant acknowledged in an interview that, after a short time, his wife and he were arguing and yelling loudly. Defendant recalled Lorena coming out and telling him to calm down. He claimed that, at that point, his gun was in his waistband.

Defendant said that his wife asked him to lend her the gun because she wanted to shoot it. Defendant stated that she really liked to shoot. Defendant indicated that Hernandez approached him and said, "Lend it to me."

In one interview, defendant indicated that Hernandez tried to take his gun away and, as defendant pulled back, his finger hit the trigger and a shot was fired. In a later interview, defendant explained that he lowered the safety because Hernandez wanted to grab his gun from him and defendant said to himself, "[L]et's see what happens." Defendant said that he was not thinking of killing his child or his wife. Hernandez tried to grab for the gun and, as defendant was pulling away, the gun went off.

Defendant told Sanchez that he heard something fall in Orlando's room and he went to look; he saw blood pouring out of Orlando. According to defendant's statement, after the first shot was fired, Lorena came out of her bedroom into the hallway. Defendant was angry and began yelling at his wife Concepcion. He yelled, "I killed my son." Defendant told Lorena that he had killed her brother. Defendant was crying, cussing at Concepcion and Hernandez, and yelling, "Look what you have done."

12

In one interview, defendant said that his wife grabbed a knife and went after him, yelling "you son of this and that," and she hit him. Defendant later claimed that he saw his wife had a knife or something shiny in her hand; she was coming towards him and cussing at him. He felt even angrier. He was crying and yelling at her that it was her fault that he killed Orlando. He shot her multiple times and she fell. Defendant Rios showed Investigator Sanchez how far apart Concepcion and he had been standing and the investigator estimated the distance to be about 10 feet.

Defendant recalled that Hernandez tried to push him to get out of the trailer and Hernandez headed toward the door. Defendant recalled saying, "Where are you going, you son of a bitch." He was angry and said, "You're also at fault. Where the fuck you going?" He shot Hernandez in the back or side. After being shot, Hernandez asked defendant why defendant had shot him.

In the interviews, defendant indicated that, as Juan was running to the office to make a phone call, defendant was getting into his pickup truck. He loaded the second magazine in the gun. Defendant drove away. After leaving his pickup truck at the graveyard across from Adan's house, defendant walked to Adan's house and borrowed Adan's car. Defendant headed toward Los Angeles on "the 101."

Defendant stated that he took "the 46" to "the 5" and, near "the 5," he saw a highway patrol car with lights and siren on and he drove into a gas station. He had his loaded gun with him. The officer drove into the gas station and defendant thought that, if the officer began investigating him, he was "going to shoot him with all [his] ammo" and kill him. Although defendant had killed his wife, son, and another man, he did not think of turning himself in and telling the officer what happened. The officer left and defendant drove to Los Angeles.

13

From Los Angeles, defendant went to Mexicali and then to San Luis Rio Colorado, Mexico. Defendant was born in Ixtlan del Rio, Nayarit; he was not a U.S. citizen.

During an interview, Investigator Sanchez told defendant that blood had been found on the door of his truck. Defendant said that he had not touched either his son or his wife after shooting them. Defendant indicated that the blood was his and he was bleeding because "the kid grabbed [his] hand." At trial, Sanchez reported that a manual for a Beretta gun was found in defendant's truck.

Investigator Sanchez told defendant that a second bullet was found in Orlando's foot during the autopsy, defendant insisted that he had initially fired only one shot. Defendant admitted that when he discovered that he shot his child, he became angry and shot his wife and the other "guy."

Defendant was arrested in Mexico. He had remarried. When asked if that relationship was also violent, defendant answered, "[J]ust lately, yes."

At one point, defendant Rios acknowledged that he had committed a crime and he agreed that he had decided to accept the consequences.

Defendant admitted that he had hit and beaten Concepcion at times. He stated that his children could be trusted to always tell the truth and they were being honest when they said that he was violent with his wife.

Defendant stated that his wife Concepcion would sometimes get jealous because he worked late. He would arrive home late and drunk and she would get mad. She would be drunk too. Sometimes his wife scratched him, pulled his hair, ripped his clothes.

Defendant recalled that one time, when he was with a woman who was just a friend, his wife hit him. He was "really mad" and he pushed her down the stairs; his wife suffered a broken leg. He took her to a hospital.

14

Defendant recalled a different occasion in March 1988 that involved an altercation with his brother-in-law; they both had knives. Defendant had just gotten off work and his brother-in-law and his wife were "drunk." Defendant had already had a beer too. His wife had told her brother about her broken leg and he was waiting for defendant. Defendant took a chair and knocked the knife from his brother-in-law's hand. Defendant "was going to cut [his] brother-in-law" and his wife "took the knife from the edge and [he] pulled it and cut her." Defendant ended up in jail. Silva, defendant's boss, got him out of jail and defendant went to live at Rancho Silva.

Defendant left his family and they were unable to pay the rent. His wife and the children went to a women's shelter. Later he "took her back."

*The Gun and Bullets*

Investigator Sanchez explained that if the chamber of a Beretta 92 F model is empty and its magazine is full, the gun cannot fire until the slide has been pulled back and a bullet is loaded into the chamber. Even then, the gun will not fire until the safety is off.

Sanchez further explained that one of several ways that a live round can end up at a crime scene is if a shooter forgets that there is already a live bullet in the chamber and cocks the gun, which kicks out a live bullet.

B. *Defense Case*

Defendant Rios testified in his own defense. In 1990, he worked on the Silva Ranch in King City. He was an irrigation foreman. Defendant initially lived in a smaller trailer, which was located next door to the larger trailer in which he was living at the time of the shootings. He moved into the larger trailer after the tractor foreman who had lived there was fatally shot by his wife. Defendant indicated that the woman and his wife were "together sometimes" and his wife had threatened him a number of times.

15

On cross-examination, defendant agreed that he was worried that the two women were plotting against him. He was also worried that his wife might shoot him one day because he was abusive to her and threatened her. He acknowledged that the woman who had shot her husband was never charged with murder because she had acted in self-defense.

On redirect examination, defendant stated that Concepcion had threatened to kill him on about three occasions. Defendant said that Concepcion had tried to shoot him with a rifle. In that instance, she was jealous and she said that defendant was with one of Adan's sisters-in-law. Defendant did not actually observe this incident but one of his brothers had taken a .22 away from Concepcion and then told defendant what happened.

When defendant and his wife Concepcion lived in Salinas in a two-story apartment, there had been an incident in which she had broken her leg. It occurred after he arrived home at about 11 p.m. and she was drunk. They started to argue. According to defendant, he told Concepcion that he was going to sleep and he did not want to argue. He went up the stairs and she followed him and they argued. Defendant shoved her and she broke her leg. Defendant took her to the hospital.

In another incident, defendant arrived home to find his wife and his wife's brother drunk. Defendant thought his wife had told her brother that he had previously hit her. His brother-in-law was angry because he did not like defendant hitting his sister. Defendant's brother-in-law pulled out a knife and came at him; defendant picked up a chair and caused the brother-in-law to drop his knife. Defendant then tried to stab his brother-in-law with another knife. According to defendant, Concepcion tried to grab his knife and cut herself.

Defendant conceded that in 1988, he was arrested for stabbing his wife with a knife and he pleaded guilty. As a result of that conviction, the judge told him he could not possess guns anymore.

16

Defendant and his wife had separated for a period of time; he lived in the small trailer on Silva Ranch and she lived with the children in San Lucas. According to defendant, they reconciled on the condition that she would not drink. She started drinking again. Some days she was okay but other days she was not.

Defendant thought that during 1989, the year prior to the shootings, he had hit his wife. His wife had told defendant that she did not want him to hit her anymore.

Defendant testified that he had been handling guns since he was about 13 or 14 years old. He had a .22 and a 30-30 shotgun when he was growing up. He had used shotguns and handguns and he liked to hunt. He knew how to handle guns safely. Defendant agreed that a safety rule is that you do not take the safety off unless you are ready to shoot the gun and you do not put your finger on the trigger unless you intend to fire the gun and he knew these rules in 1990. He acknowledged if he put his finger on the trigger he was intending to fire the gun.

Defendant had purchased a Beretta handgun from a friend about a month before the January 6, 1990 shootings. At that time, he believed that it was illegal for him to buy a gun. He could clean the Beretta and take it apart. Prior to January 6, 1990, he had fired the gun only on New Year's. The safety mechanism was working properly on the evening of January 6, 1990.

After work on the evening of June 6, 1990, defendant gave some workers a ride to town. A friend and he bought 12-pack of beer, which they drank at the friend's house. On cross-examination, defendant acknowledged he split a 24-pack with Adan and he drank more than half of it. He estimated that he drank about 14 beers.

According to defendant, he then went to a liquor store and bought another 12-pack of beer. Afterward, he drove to "check the water and some pumps." He was drinking his beer. He had his Beretta gun on the seat of the vehicle. For self-defense reasons, he always carried the gun at night when working. He stated that people would come onto

17

the ranch property and steal tractor batteries and other material. He claimed that, on the evening of the shootings, he saw a car coming, so he stopped and turned off the vehicle's lights and cocked his gun and put a bullet on top. It turned out to be a friend. After recognizing his friend and speaking to him, defendant proceeded to check the pump and reservoirs. Then he went home.

When he arrived home, defendant placed the gun, which was loaded, in his belt behind his back underneath his shirt. He ordinarily left the gun in his vehicle and he did not know why he did not do so on the night of the shootings.

On January 6, 1990, defendant did not know that Hernandez was in the trailer with his wife. He carried four cans of beer that were still full and a half-full can of beer that he was drinking into the trailer. Concepcion and her cousin Hernandez were at the kitchen table. Defendant did not recognize Hernandez whom he claimed to have last seen when Hernandez was a boy. Defendant greeted them and Hernandez said "hi." Defendant went by the table and Concepcion shook her head and gave him an angry, "dirty" look. Defendant initially testified that he did not know whether she was angry at him for being drunk. He later stated that she was angry because he came home late and he was drunk.

Defendant put his four cans of beer into the refrigerator. He saw about eight beer cans on the table; Concepcion was "really drunk." He was angry that Concepcion was drinking. He had already warned her that he did not want to see her drunk around the house. Defendant finished his open can of beer and threw it away. He agreed that he probably had drunk about 22 beers. Defendant did not realize who Hernandez was; defendant thought Hernandez was Concepcion's lover, which also made him angry.

Defendant testified that Concepcion and he began arguing over her drinking. At that point, defendant's gun was in the small of his back in his belt, the butt was sticking out, and his shirt was untucked. They were cussing at each other. Defendant denied

18

hitting Concepcion but he admitted pushing her because he was "already fed up" and "already angry." Concepcion had asked defendant where he had come from and he told her "not to be bothering" him. He said that he pushed Concepcion when he saw that she was going to grab a knife, which had a black handle and a blade about five inches long, from the table. Concepcion fell to the ground and "she made a lot of noise" "[b]ecause a chair fell over."

When asked on cross-examination why he believed his wife was "going to try to pick up . . . a knife," defendant said because they were arguing and saying, "Fuck you," and, "Fuck you," back and forth." He testified that she said, "I'm going to kill you." Defendant then indicated that he had forgotten about that threat before lunch (during direct examination).

On redirect-examination, defendant indicated that a blue-handled knife, which was marked as an exhibit, was similar to the knife that was on the table during the incident. The knife displayed at trial had a six and a half inch blade and the knife, including the handle, was about ten and a half inches long.

After defendant had pushed Concepcion and she had fallen, Lorena came out and told defendant to be quiet. Defendant told Lorena to "look at her mother" and her mother "was really drunk." Lorena went back to her room.

Defendant initially testified that Hernandez got up and picked up Concepcion but he later testified that he did not see how she got up. Defendant agreed that Hernandez tried to get in the middle and stop the argument between Concepcion and defendant.

Hernandez came toward defendant and told defendant to let him have the gun. Hernandez grabbed defendant's shirt. Defendant turned and faced Hernandez. Defendant became angry and thought that Hernandez wanted to kill him with the gun. He was concerned that his wife might be planning on killing him just like the wife of the previous occupant of the trailer.

19

Hernandez was arguing for defendant to give him the gun and trying to take the gun. Defendant was swearing and "telling him off." Defendant said to Hernandez, "You want the gun in order to kill me." Hernandez said, "I want to see it." Defendant refused to let Hernandez have the gun and defendant claimed that it was at this point that he took the gun out. Hernandez grabbed his hand and tried to take the gun away; they struggled. Defendant said, "Let go of me, you son of a bitch" "[b]ecause I'm going to shoot. . . ."

On cross-examination, defendant admitted that Hernandez did not want defendant to have the gun because defendant was beating Concepcion and he was afraid of what defendant was going to do with the gun. Defendant said that he pulled out his gun because Hernandez wanted to take his gun away.

On cross-examination, defendant admitted that instead of giving the gun to Hernandez, defendant threatened Hernandez with the gun. Defendant admitted that, although his finger was not on the trigger at first, he did put his finger on the trigger because he was very angry. Defendant believed that he took off the safety. Defendant admitted that he intended to shoot Hernandez. He admitted that he pulled the trigger twice because he wanted to kill Hernandez. Defendant acknowledged that Hernandez held the gun away and prevented defendant from shooting him.

The gun went off while they were struggling and defendant heard something fall in a bedroom and a cry. Defendant went to the bedroom's doorway, still holding the gun in his hand, and saw he had shot his son and his son was bleeding. This made defendant angrier; he blamed his wife and Hernandez. Defendant was very angry and sad and he "started crying and screaming" that, because of them, he had killed his son.

Defendant testified that he saw Concepcion come out from the kitchen holding something shiny in her hand. He testified that he thought Concepcion had grabbed the knife with the five-inch blade and was trying to kill him. She stabbed at him and he

20

sustained "a little cut" to the back of his left hand.  He saw that she had a vegetable peeler.  She stabbed at him again and cut his left hand again.

Defendant pushed Concepcion, she went sideways and stumbled or fell, and, as she was getting up, he fired his gun twice.  When he first fired at her, they were about six or seven feet apart.  Defendant was very angry and he felt desperate because he had killed his son.  He was yelling, cussing, and telling them see what you have done, you "son of a bitches."

On cross-examination, defendant indicated that he had turned the gun on Concepcion after seeing that Orlando had been shot and telling Concepcion that it was her fault that their son had been shot.  Defendant conceded that he was not afraid that Concepcion was going to kill him with a potato peeler.  He was asked, "So when you shot her, it wasn't because you had to?"  He replied, "No.  It's just that . . . by then I was very angry.  But – because of the boy who was dead.  That's why."

When defense counsel asked on redirect in essence whether defendant shot his wife because he thought Concepcion was attacking him with the potato peeler with the intent to kill him, defendant replied, "Well, to be perfectly honest, at that moment I was very angry because I had just shot my son.  I did not know what to do."

On recross-examination, defendant indicated that, when he shot Concepcion, he had pushed her, she was about seven feet away, and he knew that she had only a potato peeler in her hand.  He admitted that, when he then shot his wife in the head, he was trying to kill her.  He was very angry and he "lost his head."

Defendant recalled that Hernandez grabbed his arm and pushed him a little on his back and passed behind him.  Defendant was feeling "[a] lot of anger" because Hernandez "was the one at fault" for the killing of his son.  Defendant yelled in part, "Where are you going, you son of bitch?  It is your fault that I killed my son."  Seconds after shooting his wife, defendant shot Hernandez, who was about eight to 10 feet away.

21

He was shooting toward the door. Defendant believed that the first shot struck Hernandez in the side and Hernandez remained standing. After the second shot, Hernandez fell. Defendant believed that he had shot Hernandez again when Hernandez was on the ground.

On cross-examination, defendant agreed that Hernandez had angered him and caused him to shoot his son by accident when defendant was trying to shoot Hernandez. Defendant admitted that, when he shot Hernandez, Hernandez was going away from him and trying to escape. Defendant was trying to kill Hernandez because he was angry. Defendant conceded that all Hernandez had done to him was try to take the gun away from him when defendant was threatening his wife. During recross-examination, defendant admitted at one point that he had shot Hernandez in revenge but then he said that he did not remember.

Defendant indicated that Lorena came out of her room after the shooting was over. Defendant was feeling "very bad," angry and desperate. He walked toward the hallway and told Lorena that he had killed her brother because of her mother; he had the gun in his hand. Defendant then walked toward the door.

On cross-examination, defendant confirmed that he had told Juan that Concepcion had cut him but defendant said he made that statement when Juan was at the door and ready to leave, not earlier in the evening as Juan had testified. Juan left and defendant presumed that Juan was going to call the police from the office. Defendant left the trailer and drove away in his truck.

Defendant drove to King City and parked the pickup truck. He crossed the street and went to borrow a car from his coworker Adan. Adan lent him a Bronco. When he was leaving King City, he put a new magazine in the Beretta. Defendant drove south on Highway 101and then took Highway 46 at Paso Robles.

22

On Highway 46, he was stopped at a gas station and he saw a police car with sirens blaring. Defendant was concerned when the vehicle stopped; the officers looked at him. He was filling the Bronco with gas; his gun was in the middle of his back in his waistband and his shirt was outside his pants. An officer was talking on the radio and walking around. The police car left and headed north; defendant drove southbound toward Los Angeles.

On cross-examination, defendant denied that he was ready to kill the highway patrolman at the gas station to avoid arrest. He admitted he was willing to shoot if an officer tried to arrest him but he was not going to kill the officer. On redirect-examination, defendant said he was thinking of dying when he saw the CHP officer. On recross-examination, he admitted that he thought he "might just take [the officer]" with him.

He arrived in Los Angeles, where he stayed for about two days, and then his cousins gave him a ride to Mexicali, Mexico. From there, he traveled to San Luis Rio Colorado, Mexico, where an uncle lived. Defendant used the name Pedro Macias, he lived on a ranch, and he remarried. In 2010, defendant was arrested in this matter by Mexican authorities; he was transported to San Jose, California. Defendant recalled being questioned by investigators and he testified that he answered them honestly.

C. *Prosecution's Rebuttal Case*

Investigator Craft testified regarding a photograph that showed a potato peeler and some blood on the kitchen counter. There was also a blue-handled knife, like the one shown to defendant, on a different area of the counter in a corner of the kitchen.

Craft was also the investigator of the prior shooting that occurred in that trailer. The single shot in that case was fired into the mattress in a bedroom and did not cause any other bullet holes. The woman who had shot her husband was not charged.

23

Investigator Craft described the difference between a Beretta's single-action pull and double-action pull. In single action mode, the hammer is already cocked and it takes very little pressure to pull the trigger, which causes the hammer to drop and the gun to fire. If the shooter racks back the slide to lock and load a round and then puts on the safety, or de-cocking device, the hammer drops. When the safety is then taken off, the gun is in double-action mode and the shooter must pull the trigger all the way back to cock the hammer and fire. A double-action pull is not as easy as a single-action pull; it requires at least double the force of a single-action pull. Craft further explained that the safety on the gun is a "rotating pivot and typically a thumb can easily" take off the safety.

## II

### *Trial*

A. *Admission of Propensity Evidence*

At trial, the People presented evidence of prior domestic violence. Such evidence was admissible pursuant to Evidence Code section 1109, which was enacted in 1996.[2] (Stats. 1996, ch. 261, § 2, pp. 1795-1796.) At the time of the shootings in 1990, however, such propensity evidence was inadmissible to prove his conduct on a particular occasion. (See Evid. Code, § 1101, subd. (a); Cal. Law Revision Com. com, 29B, Pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, pp. 221-222.) Defendant now argues that the introduction of propensity evidence pursuant to Evidence Code section 1109, and the

---

[2]     Evidence Code section 1109 provided at the time of trial, and still provides, in part: "(a)(1) Except as provided in subdivision (e) . . . , in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Subdivision (e) of Evidence Code section 1109 provided at the time of trial, and still provides: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

jury's consideration of that evidence, violated the ex post facto clauses of the federal and state Constitutions.

Defendant fails to point to any ex post facto objection to the admission of evidence of prior domestic violence. Consequently, defendant forfeited this claim of error by failing to object below on this ground. (See Evid. Code, § 353; cf. *People v. Huggins* (2006) 38 Cal.4th 175, 236 [failure to object to the admission of victim-impact evidence during penalty phase forfeited contention that "trial court violated his due process rights analogous to the constitutional guaranties against ex post facto laws"].) In any event, his claim is without merit.

The U.S. "Constitution prohibits both federal and state governments from enacting any 'ex post facto Law.' Art. I, § 9, cl. 3; Art. I, § 10." (*Peugh v. U.S.* (2013) ___ U.S. ___, ___ [133 S.Ct. 2072, 2081].) In *Calder v. Bull* (1798) 3 Dall. 386, 390, 1 L.Ed. 648, Justice Chase cataloged four types of ex post facto laws. (*Carmell v. Texas* (2000) 529 U.S. 513, 521-522 [120 S.Ct. 1620].) Justice Chase described the fourth category of ex post facto laws as including " '[e]very law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*' *Id.,* at 390 (emphasis in original)." (*Ibid.*, fn. omitted.) But, "[a]s cases subsequent to *Calder* make clear, this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes. [Citations.]" (*Collins v. Youngblood* (1990) 497 U.S. 37, 43, fn. 3 [110 S.Ct. 2715].)

In *Thompson v. Missouri* (1898) 171 U.S. 380, Missouri enacted a law that made writings (letters in that case) admissible for purposes of comparing them with a writing of disputed authorship. (*Id*. at pp. 380-382.) The U.S. Supreme Court held that the statute was "not ex post facto when applied to prosecutions for crimes committed prior to its passage." (*Id*. at p. 387.) It stated: "If persons excluded upon grounds of public policy at

25

the time of the commission of an offense, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify, we cannot perceive any ground upon which to hold a statute to be ex post facto which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed. The Missouri statute, when applied to this case, did not enlarge the punishment to which the accused was liable when his crime was committed, nor make any act involved in his offense criminal that was not criminal at the time he committed the murder of which he was found guilty. It did not change the quality or degree of his offense. . . . The statute did not require 'less proof, in amount or degree,' than was required at the time of the commission of the crime charged upon him. It left unimpaired the right of the jury to determine the sufficiency or effect of the evidence declared to be admissible, and did not disturb the fundamental rule that the state, as a condition of its right to take the life of an accused, must overcome the presumption of his innocence, and establish his guilt beyond a reasonable doubt." (*Id*. at p. 387.)

The court in *Thompson v. Missouri* gave this caveat: "Of course, we are not to be understood as holding that there may not be such a statutory alteration of the fundamental rules in criminal trials as might bring the statute in conflict with the ex post facto clause of the constitution. If, for instance, the statute had taken from the jury the right to determine the sufficiency or effect of the evidence which it made admissible, a different question would have been presented." (*Id*. at p. 388.)

In *Carmell v. Texas*, *supra*, 529 U.S. 513, the principal case upon which defendant relies, the Supreme Court considered the question whether a statutory amendment that reduced the number of witnesses necessary for conviction "may be applied in a trial for offenses committed before the amendment's effective date without violating the constitutional prohibition against state ' ex post facto' laws." (*Id*. at p. 516.) Under prior

26

Texas law, a defendant could be convicted of certain sexual offenses without evidence corroborating a victim's testimony and without the victim's timely report to another *if* the victim was younger than 14 years of age at the time of the alleged offense. (*Ibid.*) An amendment to the law, which went into effect on September 1, 1993 (*id.* at p. 516), "extended the child victim exception to victims under 18 years old." (*Id.* at p. 518, fn. omitted.) At issue in the case were four convictions for offenses committed when the victim was 14 or 15 years old and the prior Texas law was in effect. (*Id.* at p. 520.)

The U.S. Supreme Court determined that "retrospective application of the amendment to [the Texas law] permitted petitioner to be convicted with *less* than the previously required quantum of evidence." (*Carmell, supra,* 529 U.S. at p. 531, italics added.) The high court concluded that "[t]he fact that the amendment authorizes a conviction on less evidence than previously required . . . brings it squarely within the fourth category" described in *Calder.* (*Ibid.*)

The Supreme Court reasoned: "A law reducing the quantum of evidence required to convict an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof . . . . In each of these instances, the government subverts the presumption of innocence by reducing the number of elements it must prove to overcome that presumption; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or by making it easier to meet the threshold for overcoming the presumption. Reducing the quantum of evidence necessary to meet the burden of proof is simply another way of achieving the same end." (*Id.* at pp. 532-533, fn. omitted.) It stated: "[W]e think there is no good reason to draw a line between laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden; the two types of laws are indistinguishable in all meaningful ways relevant to concerns of the Ex Post Facto Clause. [Citations.]" (*Id.* at p. 541.)

27

The *Carmell* court distinguished *Thompson v. Missouri*, *supra*, 171 U.S. 380 and *Hopt v. Territory of Utah* (1884) 110 U.S. 574, 588-590, which concluded that a statute making felons competent to testify in criminal prosecution was not ex post facto when applied to crimes before its enactment. (See *Carmell v. Texas*, *supra*, 529 U.S. at pp. 542-547.) *Carmell* stated: "The issue of the admissibility of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant. Evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained." (*Id*. at p. 546.) The court noted: "Ordinary rules of evidence . . . do not violate the [Ex Post Facto] Clause. . . . Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as 'unfair' or 'unjust,' they do not implicate the same kind of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard. Moreover, while the principle of unfairness helps explain and shape the Clause's scope, it is not a doctrine unto itself, invalidating laws under the Ex Post Facto Clause by its own force. [Citation.]" (*Id*. at p. 533, fn. 23.)

Contrary to defendant's assertion, this case is *not* "virtually identical to *Carmell*." Evidence Code section 1109 is plainly not a rule similar to the amended Texas law at issue in *Carmell*, which redefined a sex offense to reduce the quantum of evidence necessary to sustain a conviction of that offense. Evidence Code section 1109 is akin to the evidentiary law found *not* to be an ex post facto law in *Thompson v. Missouri*, *supra*, 171 U.S. 380.

Two cases have reached the same conclusion. (See *People v. Flores* (2009) 176 Cal.App.4th 1171, 1180-1181 ["even if admission of evidence showing a history of domestic violence disadvantages appellant, it does not violate his constitutional right to be free of ex post facto application of the law"]; *Doe v. Busby* (9th Cir. 2011) 661 F.3d 1001, 1024 [application of Evidence Code section 1109, which became effective after the habeas petitioner had allegedly committed murder and domestic violence, did not contravene the ex post facto clause of the U.S. Constitution because the law "does not alter the quantum of evidence needed to convict a defendant . . ."].)

We also reject any suggestion that the jury instruction regarding prior domestic violence resulted in an application of Evidence Code section 1109 that violated *Carmell*. To the contrary, the court admonished the jury that a finding that defendant committed uncharged domestic violence was only one factor to consider, such a conclusion was insufficient to prove defendant guilty of murder, and "[t]he People must still prove each charge and allegation beyond a reasonable doubt." The court's instruction did not lower the quantum of proof required to convict defendant.

B. *Alleged Instructional Error*

1. *Instruction on Justifiable Homicide*

Defendant argues that the trial court instructed the jury on the wrong form of justifiable homicide. He insists that his theory was *not* that the killings were justifiable based on reasonable self-defense, as to which the trial court instructed,[3] but rather that the

---

[3]     Part of the trial court's self-defense instruction pursuant to CALCRIM No. 505 informed the jury: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone else in self-defense. The defendant acted in lawful self-defense if, one, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury. Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. And, three, the defendant used no more force than was reasonably necessary to defend against that danger." It also explained that "[t]he defendant is only entitled to use that amount of

29

killings were justifiable because he was "resisting" an "attempt to murder [him], or to commit a felony, or to do some great bodily injury" to him. (§ 197, subd. 1.) He asserts his defense fits "squarely within section 197, subdivision (1)" and the trial court erred by failing to instruct in the language of CALJIC No. 5.10, which states: "Homicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime."[4]

Defendant maintains that the court incorrectly gave instructions "based on Penal Code section 197, subdivision (3) and 198 . . . ."[5] He further complains the trial court's instructions improperly required the jury to find that he "acted out of fear alone" and asserts this is not a requirement of justifiable homicide under section 197, subdivision 1.[6] He maintains that, by failing to give CALJIC No. 5.10, the trial court unconstitutionally "removed a hotly contested element of the offense," "undercut the state's obligation to prove beyond a reasonable doubt that [he] did not act with lawful justification,"

---

force that a reasonable person would believe [sic] is necessary in the same situation" and "[i]f defendant used more force than necessary, the killing was not justified."

[4] Defendant fails to mention CALJIC No. 5.16, which defines "forcible and atrocious crime."

[5] Under section 197, subdivision (3), homicide is also justifiable "[w]hen committed in the lawful defense of such person . . . , when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed . . . ." Section 198 states: "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

[6] The self-defense instruction received by the jury explained that "[t]he defendant must have believed that there was imminent danger of great bodily injury to himself" and his "belief must have been reasonable and he must have acted *only because of that belief*." (Italics added.)

30

retroactively abolished the defense under section 197, subdivision 1, in violation of due process, and unconstitutionally deprived him of his right to present his defense, his Sixth Amendment right to a jury trial, and his due process right to a fair trial.

Defendant's arguments must be rejected for three reasons. First, he misunderstands the scope of section 197, subdivision 1. Second, reasonable self-defense was his theory of justifiable homicide at trial. Third, the evidence did not warrant an instruction on a theory of justifiable homicide based on defendant resisting an attempt to commit a forcible and atrocious crime.

The bare statutory language of section 197, subdivision 1, does not fully express the governing law. In *People v. Ceballos* (1974) 12 Cal.3d 470, an unarmed person, who was attempting to burglarize the defendant's garage, was shot by a trap gun installed by defendant in his garage and the defendant was subsequently convicted of assault with a deadly weapon. (*Id*. at pp. 474-475.) The California Supreme Court observed that, "[b]y its terms subdivision 1 of Penal Code section 197 appears to permit killing to prevent any 'felony,' but in view of the large number of felonies today and the inclusion of many that do not involve a danger of serious bodily harm, a literal reading of the section is undesirable. [Citations.]" (*Id*. at pp. 477-478.)

*Ceballos* considered the case of *People v. Jones* (1961) 191 Cal.App.2d 478, in which a wife was convicted of manslaughter for killing her husband. (*People v. Ceballos*, *supra*, 12 Cal.3d at pp. 477-478.) In *Jones*, there was testimony that defendant's husband had beaten her on numerous occasions during their marriage and the defendant and her husband were arguing, he was acting drunk, and he was cursing and threatening her immediately prior to the shooting. (*People v. Jones*, *supra*, 191 Cal.App.2d at pp. 479-480.) *Ceballos* observed that "*People v. Jones* . . . , in rejecting the defendant's theory that her husband was about to commit the felony of beating her ([former] Pen. Code, § 273d) and that therefore her killing him to prevent him from doing

31

so was justifiable, stated that Penal Code section 197 'does no more than codify the common law and should be read in light of it.' " (*People v. Ceballos*, *supra*, 12 Cal.3d at p. 478.) *Ceballos* pointed out that "*Jones* read into section 197, subdivision 1, the limitation that the felony be ' "some atrocious crime attempted to be committed by force" ' " (*Ibid*.) The court quoted *Jones*: " '[T]he punishment provided by a statute is not necessarily an adequate test as to whether life may be taken for in some situations it is too artificial and unrealistic. We must look further into the character of the crime, and the manner of its perpetration [citation]. *When these do not reasonably create a fear of great bodily harm,* as they could not if defendant apprehended only a misdemeanor assault, *there is no cause for the exaction of a human life*.' [Citations.]" (*Ibid*.)

*Jones*, upon which *Ceballos* relied, explained with respect to section 197, subdivision 1, that "[t]aken at face value, and without qualification, it represents an oversimplification of the law today." (*People v. Jones*, *supra*, 191 Cal.App.2d at p. 481.) "Any civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of apparent absolute necessity. [Citation.]" (*Id*. at p. 482.) *Jones* indicated that a "misdemeanor assault must be suffered without the privilege of retaliating with deadly force. [Citations.]" (*Ibid*.)

*Ceballos* recognized murder, mayhem, rape and robbery as forcible and atrocious crimes, explaining that "[i]n such crimes 'from their atrocity and violence[,] human life [or personal safety from great harm] either is, or is presumed to be, in peril' [citations]." (*People v. Ceballos*, *supra*, 12 Cal.3d at p. 478.) It concluded that burglary was not necessarily forcible and atrocious as a matter of law: "[I]n view of the wide scope of burglary under Penal Code section 459, as compared with the common law definition of that offense, in our opinion it cannot be said that under all circumstances burglary under section 459 constitutes a forcible and atrocious crime." (*Id*. at p. 479, fn. omitted.) It determined: "Where the character and manner of the burglary do not reasonably create a

32

fear of great bodily harm, there is no cause for exaction of human life [citations], or for the use of deadly force [citation]. The character and manner of the burglary could not reasonably create such a fear unless the burglary threatened, or was reasonably believed to threaten, death or serious bodily harm." (*Ibid.*)

Accordingly, the mere fact that a person is resisting an attempt "to commit a felony, or to do some great bodily injury" (§ 197, subd. 1) is not sufficient to justify homicide despite the statutory language. (See *People v. Ceballos*, *supra*, 12 Cal.3d at pp. 477-479.) Moreover, where a person is resisting an attempt to commit a crime that is not forcible and atrocious as a matter of law, the character and manner of commission of the crime must create a reasonable fear of death or great bodily injury to justify killing. (See *People v. Ceballos*, *supra*, 12 Cal.3d at p. 479; see CAJIC No. 5.16.)

Turning to this case, we concluded that the trial court had no duty to instruct sua sponte on the theory of justifiable homicide now espoused by defendant. "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 . . . .)" (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) " 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' (*People v. Memro* (1995) 11 Cal.4th 786, 868 . . . .)" (*People v. Roldan* (2005) 35 Cal.4th 646, 715, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) " 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' (*People v. Maury* (2003) 30 Cal.4th 342, 424 . . . .)" (*People v. Martinez*, *supra*, 47 Cal.4th at p. 953.)

33

Defendant's trial brief made no mention of the theory that he killed each of the three victims while resisting the attempt to commit a forcible and atrocious crime. In fact, the brief indicated that the court should give CALCRIM Nos. 505 (justifiable homicide: self-defense), 510 (accident), and 511 (accident in the heat of passion) on the issues of justification and excuse.

In closing, defendant's trial counsel told the jury, with respect to defendant's shooting of Orlando, that defendant was struggling with Hernandez and defendant fired at Hernandez in self-defense but missed. Counsel argued that defendant "believed that he was in imminent danger of being killed," he had to use immediate deadly force, and he did not "use any more force than was reasonably necessary." Counsel further stated: "Here's the key. When deciding what the defendant believes was reasonable consider all the circumstances as they were known to and appeared to defendant at the time." His attorney presented a similar argument as to Concepcion: "[Defendant] believes he is imminent danger of being killed or suffering great bodily injury. Again, he believes that he's got to use deadly force to defend himself. And again, she's coming at him with what he perceives to be a knife. He is not using any more force than is reasonably necessary to defend against the danger. [¶] So when he shoots Concepcion, his beliefs are reasonable." As to the shooting of Hernandez, defendant's trial attorney argued that Hernandez was initially the assailant and then he tried to run and defendant was defending himself because it was "reasonably necessary to pursue an assailant" and defendant "sho[t] him in self-defense." The defense arguments suggest a theory of justifiable homicide based on only reasonable self-defense, which was covered by the court's instruction.

While there was evidence suggesting that defendant feared Concepcion or Hernandez intended to kill him, defendant did not assert at trial that anyone was actually trying to *murder* him as that crime is defined by law. Trial counsel never argued, and the

34

evidence was insufficient to show, that defendant was resisting an attempt to murder him or commit some other forcible and atrocious crime when he fatally shot the victims. (Cf. *People v. Young* (1963) 214 Cal.App.2d 641 [evidence showed defendant was resisting robbery; trial counsel had requested an instruction on that theory of justifiable homicide].)

There was no evidence that Hernandez was armed. Defendant conceded at trial that all Hernandez had done was try to take his gun away from him when defendant was threatening his wife Concepcion and defendant had then inadvertently shot his son. Even if the defendant's testimony regarding the order of events was credited by the jury, defendant admitted that he knew that Concepcion had a potato peeler (not a knife) when he fired his gun at her, he was *not* afraid that Concepcion was going to kill him with a potato peeler, she was some distance away when he shot her, and he shot her in intense anger because he had just shot his son. Defendant also acknowledged that, seconds after defendant shot his wife, he shot Hernandez in anger as Hernandez was trying to leave the trailer.

The trial court's failure to instruct in accordance with CALJIC No. 5.10 was not error.

2. *Trial Court's Failure to Instruct Sua Sponte on Relevance of Intoxication*

Defendant maintains that the trial court was required to give, sua sponte, instructions relating evidence of his intoxication to heat of passion and imperfect self-defense. This argument must be rejected because the trial court had no duty to give such instruction without a request.

In *People v. Saille* (1991) 54 Cal.3d 1103, the California Supreme Court explained: "[E]vidence of [a defendant's] intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the

35

defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him [citation], but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court." (*Id*. at p. 1120.) "It is well settled that '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' (*People v. Rundle* (2008) 43 Cal.4th 76, 145, citing *People v. Saille* (1991) 54 Cal.3d 1103, 1120.)"[7] (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

3. *Instruction on Voluntary Intoxication*

Defendant complains that the trial court's intoxication instruction "precluded the jury from considering intoxication in connection with provocation and imperfect self-defense." As defendant correctly points out, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

In this case, the trial court instructed: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or defendant acted with deliberation and premeditation. . . . You may [sic] consider evidence of voluntary intoxication for any other purpose."[8] This is standard language contained in CALCRIM No. 625.

---

7    "Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case . . . .' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.)

8    The reporter's transcript indicates that the trial court misspoke and said "may" instead of "may not." If the jury understood the court as permitting evidence of voluntary intoxication to be considered "for any other purpose," defendant's entire argument falls.

Defendant asserts that the court's instruction improperly limited the jury's consideration of the evidence of his intoxication, which was relevant to whether he had acted in the heat of passion and whether he held a subjective belief that imminent danger necessitated the use of deadly force.  He points to *People v. Cameron* (1994) 30 Cal.App.4th 591, in which a defendant was convicted of second degree murder.  (*Id*. at p. 594.)

In *Cameron*, the appellate court concluded that the trial court prejudicially erred by giving a voluntary intoxication instruction that implied that evidence of voluntary intoxication should be disregarded in determining whether the defendant acted with actual knowledge that his conduct endangered life and conscious disregard for life.  (*Id*. at pp. 594, 600, 605.)  The court stated: "Intoxication is a circumstance from which the jury might find that defendant's act in response to the provocation should be attributed to passion rather than judgment."  (*Id*. at p. 601.)  The court also said: "Proof of intoxication tends to support a claim of honest but mistaken belief in an imminent aggravated assault, providing a reason to account for the defendant's objectively unreasonable belief [in the need to defend himself]."  (*Ibid*.)

At the time of defendant Rios's trial in 2011, former section 22, subdivision (b), as amended in 1995 provided: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored *express malice aforethought*."[9]  (Stats.1995, ch. 793, § 1, p. 6149, italics added.)  That

_____

We assume this was a transcription error for purposes of appeal and address the claim on its merits.

[9] Former section 22 was renumbered as section 29.4 in 2012.  (Stats.2012, ch. 162, § 119, p. 2617.)  At an earlier time, former section 22, subdivision (b), had provided: "Whenever the actual existence of *any mental state*, including but not limited to, purpose, intent, knowledge, or malice aforethought, is a necessary element to constitute any particular species or degree of crime, evidence that the accused was voluntarily

1995 amendment of former section 22 effectively abrogated *People v. Cameron*, *supra*, 30 Cal.App.4th 591, the case upon which defendant relies. At the time of defendant's trial, evidence of voluntary intoxication was not admissible under former section 22 on the issue whether a defendant acted with implied malice regardless of the relevancy of that evidence to such mental state.[10]

We do recognize, however, that former section 22 permitted evidence of voluntary intoxication to be admitted on the issue of whether a defendant, charged with murder, "harbored express malice aforethought." (Stats.1995, ch. 793, § 1, p. 6149.) Malice aforethought is "express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188, italics added.) The "word 'unlawfully' modifies the word 'intention' so that [section 188] requires an intent to act unlawfully or,

___

intoxicated at the time of the commission of the crime is admissible on the issue as to whether the defendant actually formed any such mental state." (Stats.1981, ch. 404, § 2, p. 1592, italics added.) In 1982, that subdivision was amended to read: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored *malice aforethought*, when a specific intent crime is charged." (Stats. 1982, ch. 893, § 2, pp. 3317-3318, italics added.) The 1982 amendment "clarified that the 1981 amendment did not extend the admissibility of intoxication to general intent crimes. [Citation.]" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1128.) In 1995, former section 22 was again amended to make evidence of voluntary intoxication admissible with respect to only express, not implied, malice. The amendment abrogated *People v. Whitfield* (1994) 7 Cal.4th 437, which had concluded "[former] section 22 was not intended, in murder prosecutions, to preclude consideration of evidence of voluntary intoxication on the issue whether a defendant harbored malice aforethought, whether the prosecution proceeds on a theory that malice was express or implied." (*Id*. at p. 451; see *People v. Mendoza*, *supra*, 18 Cal.4th at pp. 1126, 1133.)

[10] "[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i. e., a subjective standard. (*People v. Phillips* [(1966) 64 Cal.2d 574,] 588 . . . .)" (*People v. Watson* (1981) 30 Cal.3d 290, 296-297.) "*[M]alice* may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 722-723 . . . ; *People v. Phillips* (1966) 64 Cal.2d 574, 587 . . . .)" (*Id*. at p. 296.)

put in everyday language, the defendant must have a wrongful intent." (*In re Christian S.* (1994) 7 Cal.4th 768, 778.) " '. . . Generally, the intent to unlawfully kill constitutes malice. (§ 188; *People v. Saille* (1991) 54 Cal.3d 1103, 1113 . . . ; see *In re Christian S.* (1994) 7 Cal.4th 768, 778-780 . . . .) "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice . . . when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or . . . kills in 'unreasonable self-defense'–the unreasonable but good faith belief in having to act in self-defense [citations]." ([*People v. Barton* (1995) 12 Cal.4th 186,] 199 . . . .)' (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154 . . . .)" (*People v. Rios* (2000) 23 Cal.4th 450, 460-461, fn. omitted; see *People v. Moye* (2009) 47 Cal.4th 537, 549 [heat of passion and imperfect self-defense are " 'theories of partial exculpation' that reduce murder to manslaughter by negating the element of malice. [Citation.]"].)

Thus, "intent to kill" does not always equate to express malice because a person can intend to kill yet not act with express malice as in the case of voluntary manslaughter committed with intent to kill. (See *People v. Bryant*, *supra*, 56 Cal.4th at pp. 968 ["A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter. [Citation.]"], 970 [voluntary manslaughter requires either an intent to kill or a conscious disregard for life].) By referring to "intent to kill" rather than to express malice or its legal equivalent ("intent to unlawfully kill"), the trial court's voluntary intoxication instruction failed to properly inform the jury that it could consider evidence of defendant's voluntary intoxication on the issue whether or not defendant killed with express malice.[11] (But see *People v. Turk* (2008) 164 Cal.App.4th 1361 (*Turk*), 1381-1384 [CALCRIM No. 625

---

[11]     We urge the Judicial Council to revisit CALCRIM No. 625.

39

correctly states the law]; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298 [stating, without any analysis concerning "intent to kill" language in section 22, CALCRIM No. 625 is "true to section 22, as amended"].)  The trial court's instruction that "[t]he defendant acted with express malice if he unlawfully intended to kill" did not cure the defect because it left the jury unaware that it could fully consider evidence of defendant's voluntary intoxication on the question of whether the killings had been carried out with express malice, not merely on the narrower issue of "intent to kill."  (But see *Turk*, *supra*, 164 Cal.App.4th at pp. 1382-1383.)

Although we find the court's voluntary intoxication instruction constituted error, it does not require reversal.  The instruction allowed the jury to consider evidence of defendant's voluntary intoxication with regard to premeditation and deliberation.  The jury was instructed that "[t]he defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences, decided to kill." It was also told that "[a] decision to kill made rashly, impulsively or without careful consideration is *not* deliberate and premeditated."  (Italics added.)  As the trial court instructed, to find that defendant killed in the heat of passion, the jury had to conclude that "the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment."  (See *People v. Breverman* (1998) 19 Cal.4th 142, 163.)  By convicting defendant of three counts of first degree murder in light of the intoxication evidence, the jury impliedly resolved that defendant did not act rashly but rather he deliberated and premeditated.  Thus, the jury necessarily decided that defendant did not have the state of mind required for killing in the heat of passion.

The court also fully instructed on voluntary manslaughter based on a killing in imperfect self-defense.  Its instructions described the requisite state of mind: "The defendant acted in imperfect self-defense if, one, the defendant actually believed he was in imminent danger of being killed or suffering great bodily injury.  And, two, the

defendant actually believed that the immediate use of force was necessary to defend against the danger."  The court told the jury: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant."

At trial, defendant acknowledged that Hernandez had merely tried to take the gun away from him when defendant was threatening his wife Concepcion and Hernandez did not want defendant to have a gun because defendant was beating Concepcion.  Defendant admitted he was not afraid that Concepcion was going to kill him with a potato peeler. After shooting Concepcion, defendant shot Hernandez as he tried to leave.

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' (*Breverman*, *supra*, 19 Cal.4th at p. 177 . . . ; see *People v. Prince* (2007) 40 Cal.4th 1179, 1267-1268 . . . .)"  (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)  Given the court's proper instructions and the ample evidence of murder, including defendant's own statements and testimony, it is not reasonably probable that defendant would have obtained a more favorable outcome had the court properly informed the jury that evidence of defendant's voluntary intoxication could be considered in deciding whether he acted with express malice.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135; Cal. Const., art. VI, § 13.)

Defendant has not argued and the record does not show that there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated the federal Constitution.  (See *Estelle v. McGuire* (1991) 502 U.S. 62, 71-73 [112 S.Ct. 475]; see also *Middleton v. McNeil* (2004) 541 U.S. 433, 437 [124 S.Ct. 1830] (per curiam).)

41

C. *Alleged Ineffective Assistance of Trial Counsel*

1. *Strickland Standard*

In *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052] (*Strickland*), the United States Supreme Court established a two-part test for evaluating a claim of ineffective assistance of counsel (an IAC claim). "First, the defendant must show that counsel's performance was deficient." (*Id*. at p. 687.) "Second, the defendant must show that the deficient performance prejudiced the defense." (*Ibid*.)

As to the performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Id*. at p. 688.) "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (*Ibid*.)

"Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Id*. at p. 689.) Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (*Ibid*.)

As to the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Id*. at p. 693.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.]

42

Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington v. Richter* (2011) 131 S.Ct. 770, 791-792.)

The U.S. Supreme Court has advised that "[t]he object of an ineffectiveness claim is not to grade counsel's performance" and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.) It is unnecessary to "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Ibid.*)

2. *Alleged Failure to Investigate and Consult Experts*

Defendant maintains that "defense counsel's failure to open critical discovery provided by the state" renders the *Strickland* standard of review inapplicable and brings it within the rule of *U.S. v. Cronic* (1984) 466 U.S. 648 [104 S.Ct. 2039] (*Cronic*). He maintains that defense counsel's "failure to conduct a pretrial investigation or even look at the forensic discovery provided by the state effectively denied [him] counsel at a critical stage of the proceedings" and meant that "the defense failed to subject the state's case to meaningful adversarial testing."

Generally, there is "no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt. [Citations.]" (*Cronic*, *supra*, 466 U.S. at p. 659, fn. 26.) *Cronic's* rule of presumed prejudice and automatic reversal is reserved for limited circumstances. (*Id.* at p. 659.) Under *Cronic*, the Sixth Amendment is violated where there is a "complete denial of counsel" or a defendant is "denied counsel at a critical stage of his trial." (*Ibid.*,

43

fn. omitted.)  There is also a violation where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . ."  (*Ibid*.)  A denial of the Sixth Amendment right to counsel occurs in a third situation, not being invoked here, when "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."[12]  (*Id*. at pp. 659-660.)

In *Cronic*, the defendant lost his retained counsel shortly before the scheduled trial date and the "court appointed a young lawyer with a real estate practice to represent respondent, but allowed him only 25 days for pretrial preparation, even though it had taken the Government over four and one-half years to investigate the case and it had reviewed thousands of documents during that investigation."  (*Cronic*, *supra*, 466 U.S. at p. 649.)  As the California Supreme Court observed, in *Cronic* "the court-imposed limitations on counsel's ability to prepare for trial likely affected trial strategy, witness preparation, and plea negotiations."  (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1109.)  "Yet the [U.S.] Supreme Court declined [in *Cronic*] to presume a Sixth Amendment violation and remanded the case so the defendant might specify exactly how the trial court's order had deprived him of the effective assistance of counsel.  (*Cronic*, *supra*, 466 U.S. at pp. 666-667, 104 S.Ct. 2039.)"  (*Id*. at pp. 1109-1110.)

Here, the Monterey County Public Defender (P.D.) was appointed to represent defendant at the time scheduled for his felony arraignment.  Deputy P.D. John

---

[12]    In *Cronic*, the Supreme Court offered *Powell v. Alabama* (1932) 287 U.S. 45 [53 S.Ct. 55] as an example of this third category.  (*Cronic*, *supra*, 466 U.S. at pp. 660-661.)  In *Powell v. Alabama*, *supra*, 287 U.S. 45, a capital case tried in 1931, an out-of-state attorney, who was not prepared to go to trial and was unfamiliar with Alabama procedure, was drafted by the judge on the day of trial to represent black defendants charged with rape of two white girls.  (*Powell v. Alabama*, *supra*, 287 U.S. at pp. 49-50, 53-56.)

Klopfenstein represented defendant in pretrial proceedings. The record does not demonstrate that defendant was completely denied counsel during the pretrial period from arraignment to trial. Rather, he is specifically complaining that his trial counsel failed to open or investigate the prosecution's evidence provided to counsel, he failed to consult a ballistics expert, and he failed to consult a trajectory expert. [13]

In *Bell v. Cone* (2002) 535 U.S. 685 [122 S.Ct. 1843], a capital defendant unsuccessfully contended that *Cronic* rather than *Strickland* governed his claim that "his counsel rendered ineffective assistance during the sentencing phase by failing to present mitigating evidence and by waiving final argument." (*Id.* at pp. 692, 694.) The Supreme Court clarified: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' *Cronic, supra,* at 659, 104 S.Ct. 2039 (emphasis added). Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points." (*Id.* at pp. 696-697.) That court further stated: "The aspects of counsel's performance challenged by respondent-the failure to adduce mitigating evidence and the waiver of closing argument-are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components." (*Id.* at p. 697-698.) The court made clear that the difference between cases subject to *Cronic* and those subject to *Strickland* is not a matter of the degree of ineffectiveness but is a difference of kind. (*Id.* at p. 697.)

---

[13]    As mentioned below, the prosecutor told the court during the post-trial motion for a new trial that counsel Klopfenstein and he had jointly gone through all the physical evidence, including photographs, before trial and Klopfenstein had asked for copies of photographs in CD format.

45

A trial counsel's alleged failure to adequately investigate a case and consult with experts is exactly the type of ineffectiveness subject to the *Strickland* standard.  The Supreme Court stated in *Strickland, supra,* 466 U.S. 648:  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  (*Id*. at pp. 690-691.)  "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.  [Citation.]"  (*Id*. at p. 691.)

Even assuming that trial counsel Klopfenstein failed to adequately prepare for trial and consult appropriate experts, defendant still must demonstrate prejudice under the *Strickland* standard.  (See *Strickland*, *supra*, 466 U.S. at pp. 687, 693-694.)  The appellate record does not reveal any likelihood that further investigation and consultation with experts would have produced opinion testimony favorable to his defense or would have led to a different and more successful trial strategy.  It appears that any showing of prejudice related to allegedly inadequate pretrial preparation and investigation is dependent upon evidence outside the record and, therefore, defendant's contention must

46

be raised in a petition for writ of habeas corpus.  (See *People v. Williams* (2013) 56 Cal.4th 630, 693.)

3.  *Failure to Object to Court's Self-Defense Instructions*

Defendant asserts that trial counsel Klopfenstein provided ineffective assistance by failing to object to the trial court's allegedly erroneous self-defense instruction.  As explained, the trial court correctly instructed the jury based on the defense's theory of self-defense that was advanced at trial and the evidence.  Accordingly, counsel's failure to object to the court's self-defense instructions did not constitute deficient performance.  (See *Strickland*, *supra*, 466 U.S. at pp. 687-688; cf. *People v. Castaneda* (2011) 51 Cal.4th 1292, 1350.)

4.  *Failure to Request Pinpoint Intoxication Instructions*

Defendant maintains that trial counsel should have requested instructions relating his intoxication to the defenses of heat of passion and imperfect self-defense.  Defendant has not demonstrated that his counsel's failure to request such pinpoint instructions was prejudicial.

As previously indicated, the instructions clearly allowed the jury to fully consider the evidence of defendant's voluntary intoxication in deciding whether the killings were deliberate and premeditated and it necessarily resolved that defendant acted with reflection and not rashly.  Under the instructions given, the jury could consider "all the circumstances as they were known and appeared to the defendant" in deciding whether defendant actually believed that he needed to defend himself with deadly force against imminent danger of death or great bodily injury.  Given the court's instructions and the evidence, which we discussed with respect to defendant's challenge to the court's voluntary intoxication instruction, there is no reasonable probability that the result of the proceeding would have been more favorable to defendant had trial counsel requested

47

such pinpoint instructions. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 693-694; *Harrington v. Richter*, *supra*, 131 S.Ct. at pp. 791-792.)

5. *Alleged Reliance on Abolished Diminished Capacity Defense*

Defendant contends that trial counsel provided ineffective assistance by relying on the abolished theory of diminished capacity due to voluntary intoxication.

In his closing argument directed at the killing of Hernandez, defendant's counsel told the jury that it could consider the evidence of voluntary intoxication "only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation." He then explained that "what voluntary intoxication does is it negates . . . the specific intent element, the specific intent element of premeditation, deliberation or intent to kill." Counsel argued: "So you have to find that if Mr. Rios is voluntarily intoxicated, therefore, he couldn't form the intent to kill or the premeditation and deliberation. You have to negate first-degree and second-degree murder and find voluntary manslaughter. That's the law." The prosecution then interposed an objection, which the trial court sustained.

Later in closing argument, defendant's counsel suggested to the jury: "If in fact you find that there . . . isn't self-defense, the best that can be done . . . in this case is that there's provocation, sudden quarrel, imperfect self-defense, voluntary intoxication. They all negate. They all go and they equal . . . voluntary manslaughter." He maintained that there was no evidence of premeditation, deliberation, or intent to kill.

"In *People v. Conley* (1966) 64 Cal.2d 310 . . . (*Conley*), . . . [the California Supreme Court] developed the doctrine, since abrogated by statute (see *People v. Saille* (1991) 54 Cal.3d 1103, 1113; *In re Christian S.* (1994) 7 Cal.4th 768, 774), that a defendant's diminished mental capacity could reduce murder to voluntary manslaughter." (*People v. Bryant*, *supra*, 56 Cal.4th at p. 969.) " 'The essence of a showing of diminished capacity [was] a "showing that the defendant's mental capacity was reduced

48

by mental illness, mental defect or intoxication." ' (*People v. Berry, supra,* 18 Cal.3d at p. 517 . . . .)" (*People v. Steele* (2002) 27 Cal.4th 1230, 1253, italics omitted.)  The defense of diminished capacity was abolished in 1981.  (See *People v. Horton* (1995) 11 Cal.4th 1068, 1118; Stats.1981, ch. 404, pp. 1591-1592; see § 25.)[14]

We need not resolve whether defense counsel was making a shorthand argument,[15] misspoke in the heat of argument, or was actually relying on a theory of diminished capacity.  Defendant has not established the requisite prejudice.  (*Strickland*, *supra*, 466 U.S. at p. 694; *Harrington v. Richter*, *supra*, 131 S.Ct. at pp. 791-792.)

The prosecutor objected to the defense attorney's statement that "voluntary intoxication negates the element of malice aforethought" and the trial court sustained the objection.  The court referred the jury to its instruction on voluntary intoxication.  Its instructions informed the jury: "If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The court fully instructed the jury on the law of homicide, including voluntary manslaughter in the heat of passion or in imperfect self-defense, as appropriate to the case.  We presume the jury followed those instructions.  (See *People v. Avila* (2009) 46 Cal.4th 680, 719.)  The court properly instructed the jury regarding its consideration of evidence of defendant's voluntary intoxication on the issues of premeditation and deliberation.  Insofar as the instruction told the jury that it could consider such intoxication on the issue whether

_____

[14]     Section 25, subdivision (a), states:  "The defense of diminished capacity is hereby abolished.  In a criminal action . . . , evidence concerning an accused person's intoxication . . . shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

[15]     The Supreme Court recently stated:  "We have often described both provocation and unreasonable self-defense as 'negating' the malice required for murder or as causing that malice to be 'disregarded.' [Citations.]"  (*People v. Bryant*, *supra*, 56 Cal.4th at p. 968.)

defendant had the "intent to kill" rather than whether he acted with express malice (i.e. the intent to unlawfully kill), we have already resolved that such error was harmless. (*Ante,* at pp. 36-41.)

6. *Effect of Multiple Instances of Alleged Ineffective Assistance*

Defendant maintains that all the instances of alleged ineffective assistance, cumulatively resulted in prejudice. He has not shown that it is reasonably likely that the result in this case would have been different even considering the entirety of trial counsel's alleged deficient performance. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 693-694; *Harrington v. Richter*, *supra*, 131 S.Ct. at pp. 791-792.)

III

*Post-Trial*

A. *General Background*

1. *Trial*

Defendant was represented by Deputy P.D. Klopfenstein during trial. Mid-trial it came to light that Klopfenstein had been arrested for driving under the influence and charges were likely to be filed by the District Attorney. The trial court explained the potential conflict of interest to defendant. The court asked attorney Liner, who was not part of the P.D.'s Office and who happened to be in the courtroom, to advise defendant regarding waiver of the potential conflict. After privately speaking with Liner, defendant indicated he was willing to waive any potential conflict. Some time later, P.D. James Egar arrived and indicated to the court that he had additional information of which attorney Liner was unaware. Attorney Liner, P.D. Egar, Assistant P.D. Landis, and Deputy P.D. Klopfenstein impliedly conversed off the record. Back on the record, attorney Liner indicated to the court that he had received additional information that he should disclose to and discuss with defendant and a further waiver from defendant may be needed. After privately speaking with defendant again regarding the potential conflict

50

and alcohol-related issues, attorney Liner told the court that the defendant wished Klopfenstein to continue serving as his attorney. Defendant Rios confirmed that was correct.

## 2. *Post-trial Proceedings*

At the time scheduled for sentencing after trial, the P.D. declared a conflict. The P.D. then filed a memorandum in support of that conflict of interest declaration. In the memorandum, the P.D. indicated that it was his responsibility to "make the determination that his representation has be[en] sufficiently compromised by ineffective assistance of counsel by one of his deputies to request being relieved as counsel . . . . in the upcoming post-trial, pre sentence proceedings." He asked to be relieved as counsel and for independent counsel to be appointed. The P.D. acknowledged that the trial court may properly inquire into the reasons for the conflict but he asserted that he "may not disclose, nor may [the trial court] compel statements that may violate attorney/client and/or work product privileges." The P.D. also stated that "trust concerns have arisen" between defendant and the P.D. as to the adequacy of his future representation.

On September 6, 2011, P.D. Egar agreed that it was appropriate to hold a *Marsden* hearing (see *People v. Marsden* (1970) 2 Cal.3d 118). The trial court proceeded to hold a closed *Marsden* hearing and inquired into the reasons defendant wanted to have a new attorney. During the hearing, P.D. Egar indicated that attorney Klopfenstein had been placed on administrative leave and an administrative personnel proceeding had been commenced against Klopfenstein. Egar confirmed that attorney Klopfenstein had hired his own attorney with regard to the personnel matter. Egar believed that Klopfenstein, now represented by counsel, was precluded from talking to him. Egar thought there was "a substantial claim for IAC." He also indicated that the County of Monterey (County) was concerned and he had been advised that "substantial sums . . . flow from just these kinds of morasses."

51

On September 8, 2011, the court continued with the closed *Marsden* hearing. P.D. Egar indicated that he did not have any "specific articulable facts" indicating that Klopfenstein was under the influence at work. The court asked Egar to disclose to the court the information that he had shared with attorney Liner for purposes of advising defendant during trial regarding waiver of the potential conflict of interest arising from his trial counsel's DUI arrest. Egar asserted that a prima facie showing of ineffective assistance had been made. He indicated that he did not want to be evasive but he was "mindful that there are many conflicting responsibilities, first and foremost, of course, to Mr. Rios, but also to the county, also to the office, also to potential liability, financial liability." He stated that defendant Rios's "interests are prejudiced when his attorney is being asked to make an argument on behalf of his own incompetence."

At the end of the closed hearing on September 8, 2011, the trial court asked for further briefing with respect to the effect of the conflict issue on the *Marsden* motion. It continued the post-trial *Marsden* hearing. Back on the record, the court told the prosecutor that it had not ruled and their discussion had "focused primarily on the public defender's desire to declare a conflict and whether the Court is going to accept that conflict."

On September 22, 2011, the P.D. filed a further memorandum in support of his asserted conflicts of interest. On September 23, 2011, Egar filed a sealed declaration in court.

At the hearing on September 23, 2011, Assistant P.D. Landis stated that "we can't go forward with a new trial motion in good faith and zealously represent the client" if we have to "call ourselves incompetent." The trial court disagreed, stating, "I'm not sure that anyone would be more zealous than yourself and Mr. Egar in this matter."

The trial court then proceeded with the closed *Marsden* hearing. Defendant eventually made clear that he had no concerns with his current representation by P.D.

52

Egar and Assistant P.D. Landis and he was comfortable with their representation. Defendant confirmed that his concerns had been with attorney Klopfenstein's performance and he was not concerned about his future representation by P.D. Egar and Assistant P.D. Landis. Once the court ascertained that defendant was not making a *Marsden* motion with regard to counsel currently representing him, the court denied the motion.

While still in a closed hearing, the trial court observed that P.D. Egar "may have some incentive to prevail or to try to prevail in your personnel issue, and proving ineffective assistance of counsel on Mr. Klopfenstein may assist you in your personnel issue." He told Egar "that is not a conflict with your client, that actually dovetails nicely into the position that he may want to take and it might benefit him greatly." The court noted that Egar had "reassigned each and every one of Mr. Klopfenstein's cases" within the Public Defender's Office despite "perceived inadequacies or suspected deficiencies" with respect to Klopfenstein's performance, which indicated to the court that Egar still had confidence in the ability of the office to "effectively and competently handle" those cases. It denied the P.D's request for substitute counsel.

Back in open court on September 23, 2011, the trial court stated for the record that it had denied both defendant's *Marsden* motion and the P.D.'s request for substitute counsel based on the asserted conflict of interest.

The P.D. subsequently filed a written motion for a new trial based on trial counsel's alleged ineffective assistance. It was argued that trial counsel Klopfenstein had provided ineffective assistance by failing to keep adequate file notes, to meet and confer with his client, to adequately investigate the case, to interview witnesses, to investigate mental health issues, and to consult experts.

On December 2, 2011, at the hearing on the new trial motion, P.D. Egar indicated that he wanted to state his asserted conflicts of interest for the record. He also assured the

53

court that he would "be doing everything [he could] to maintain his fiduciary duty to Mr. Rios" and he "certainly [was] not intending to withhold making any arguments . . . ." He then explained that, as the P.D. and attorney of record, he had a conflict of interest because he was in effect arguing his own ineffectiveness. He indicated that there was also a conflict between the P.D. and the County because of the County's potential liability for ineffective assistance of counsel. He described a third conflict between the P.D.'s Office and Klopfenstein stemming from the P.D.'s "duty of loyalty to him to assert his privacy rights" as to health and personnel matters. Egar identified a fourth conflict, which was Klopfenstein's own motivation to underplay his incompetence . . . in an effort to retain his employment." Egar did not ask the trial court to revisit its prior ruling or indicate that he now labored under a new conflict of interest not previously addressed. After his recitation, Egar turned to the new trial motion.

The prosecutor represented to the court that Klopfenstein and he had spent hours together going through all the physical evidence, including all the photographs that were at the Sheriff's Office. According to the prosecutor, Klopfenstein had asked for CD copies of the photographs, which were not digital, and the Sheriff's Office had converted the photographs into CD's and provided them to Klopfenstein.

At the end of the hearing on the motion for a new trial based on ineffective assistance of trial counsel, the court found that defendant had failed to show prejudice from his trial counsel's allegedly deficient performance. It denied the motion for a new trial.

B. *Brief Exclusion of the P.D. During Post-Trial Marsden Hearing*

1. *P.D. Egar Briefly Excluded from Marsden Hearing*

On September 23, 2011, over P.D. Egar's objection, the trial court excluded Egar from its private exchange with defendant and attorney Liner during the continued *Marsden* hearing; a Spanish interpreter was present. Before asking Egar to step outside,

54

the court explained that Egar had not been a party to attorney Liner's advice to defendant during trial with respect to trial counsel Klopfenstein's potential conflict. The trial court then privately discussed with attorney Liner and defendant the information and advice that had been given to defendant and defendant's decision to waive Klopfenstein's potential conflict of interest. Egar then rejoined the proceedings. After further questioning, the court determined that defendant was not concerned with his current representation by the P.D.'s Office but rather with his past representation by Klopfenstein. As indicated, the court denied the *Marsden* motion and the P.D.'s request to be relieved as counsel.

2. *Analysis*

Defendant argues that he was unconstitutionally deprived of counsel at a critical stage when the court temporarily excluded P.D. Egar from the September 23, 2011 hearing. He asserts that a new trial motion is a critical stage of criminal proceedings and this case must be remanded for another new trial motion.

"[The Supreme Court's] cases have construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings. The guarantee reads: 'In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' (Emphasis supplied.) The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.' " (*U.S. v. Wade* (1967) 388 U.S. 218, 224-225 [87 S.Ct. 1926] [lineup].) "The cases have defined critical stages as proceedings between an individual and agents of the State (whether 'formal or informal, in court or out,' see *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)) that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary,' *United States v. Ash*, 413 U.S. 300, 312–313, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); see also *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246

55

(1964)."  (*Rothgery v. Gillespie County, Tex.* (2008) 554 U.S. 191, 212, fn. 16 [128 S.Ct. 2578].)  Counsel is "required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected. "  (*Mempa v. Rhay* (1970) 389 U.S. 128, 134 [88 S.Ct. 254].)

The U.S. Supreme Court has explained:  "The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial."  (*U.S. v. Cronic, supra,* 466 U.S. 648, 659.)  It "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.  [Citations.]"  (*Id.* at p. 659, fn. 25.)

While a post-trial, pre-appeal new trial motion may be a critical stage of a criminal proceeding (*McAfee v. Thaler* (5th Cir.2011) 630 F.3d 383, 391; *Menefield v. Borg* (9th Cir.1989) 881 F.2d 696, 698–699), the September 23, 2011 hearing was not a hearing on a new trial motion but rather a post-trial *Marsden* hearing.  It turned out that the *Marsden* motion was only directed at Klopfenstein whom had already been taken off the case. Since a *Marsden* motion is concerned only with ensuring effective assistance of counsel going forward,[16] the trial court denied the motion.

---

[16] "[A]t any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to [the Supreme Court's] holding in *Marsden*, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney. (*Marsden*, *supra*, 2 Cal.3d at p. 126 . . . .)  In turn, if the defendant makes a showing during a *Marsden* hearing that his right to counsel has been 'substantially impaired' (*Marsden*, *supra*, 2 Cal.3d at p. 123 . . .), substitute counsel must be appointed as attorney of record for all purposes. [Citation.]" (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.)  "It is the very nature of a *Marsden* motion, at *whatever* stage it is made, that the trial court must determine whether counsel has been providing competent representation.  Whenever the motion is made, the inquiry is forward-looking in the sense that counsel would be substituted in order to provide effective assistance in the *future*." (*People v. Smith* (1993) 6 Cal.4th 684, 694-695.)

At that time of P.D. Egar's brief exclusion from the *Marsden* proceedings, the P.D. had not yet filed a motion for a new trial on defendant's behalf. A new trial motion was filed and the P.D. Egar himself advocated for a new trial on defendant's behalf. Defendant was not entirely deprived of counsel during the critical stage of his new trial motion.

Defendant has not demonstrated that a substantive right was at stake during the brief time Egar was excluded from the post-trial *Marsden* hearing. "The Ninth Circuit uses a three-factor test for determining whether a proceeding is a *Cronic* critical stage: (1) whether the failure to pursue strategies or remedies results in a loss of significant rights, (2) whether counsel would be useful in helping the defendant understand the legal issues, and (3) whether the proceeding tests the merits of the defendant's case. *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir.2006); see also *United States v. Benford*, 574 F.3d 1228, 1232 (9th Cir.2009). Any one of these factors may be sufficient to make a proceeding a critical stage. *Hovey*, 458 F.3d at 901-02." (*McNeal v. Adams* (9th Cir. 2010) 623 F.3d 1283, 1289.) The record does not show that Egar's brief exclusion from the courtroom implicated any of these factors.

Defendant does not claim that, during Egar's absence, he "required aid in coping with legal problems or assistance in meeting his adversary." (*U.S. v. Ash* (1973) 413 U.S. 300, 313 [93 S.Ct. 2568].) He does not show that the exclusion of P.D. Egar held significant consequences for him. (*Bell v. Cone*, *supra*, 535 U.S. at p. 696 ["Critical stage" "denote[s] a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused. [Fn. omitted.]"].)

Accordingly, we conclude defendant was not entirely deprived of counsel at a critical stage of the proceeding within the meaning of *Cronic*. (Cf. *U.S. v. Benford* (9th Cir. 2009) 574 F.3d 1228, 1231-1233 [pretrial status conference was not a "critical stage" in that case]; *Hereford v. Warren* (6th Cir. 2008) 536 F.3d 523, 529-530 [midtrial bench

conference between prosecution, codefendant's counsel, and court without defendant's counsel did not qualify as *Cronic* error]; *U.S. v. Olano* (9th Cir. 1995) 62 F.3d 1180, 1193 [midtrial conference with court, to which defense counsel arrived late, was not "critical" phase of trial because "matters discussed were minor"].)

C. *Public Defender's Alleged Conflict of Interest in Post-trial Phase*

Although defendant does not challenge the court's ruling on his motion for a new trial, defendant argues that the trial court improperly forced P.D. Egar, who had asserted conflicts of interest, to represent him on the motion. He maintains that the trial court failed to adequately inquire into those asserted conflicts and the P.D.'s ability to effectively represent defendant on a new trial motion or at sentencing. Defendant faults the court for not asking "how Mr. Egar could balance his duty to safeguard his employee's work-and health-related privacy while at the same time using Klopfenstein's work-and health-related issues as possible bases for an ineffective assistance of counsel claim" and asking "how Mr. Egar could a litigate a new trial motion given that Klopfenstein had hired a lawyer and was refusing to speak to him." He states that "[w]here the trial judge fails to make an adequate inquiry, prejudice is presumed and reversal is automatic. [Citations.]" He claims that this court must reverse and remand the matter for a hearing on a new trial motion presented by conflict-free counsel.

1. *Legal Background*

"The federal and state constitutional right to counsel in a criminal case also includes the right to representation free of conflicts of interest that may compromise the attorney's loyalty to the client and impair counsel's efforts on the client's behalf. (E.g., *Glasser v. United States* (1942) 315 U.S. 60, 69-70, 62 S.Ct. 457, 86 L.Ed. 680; *People v. Doolin* (2009) 45 Cal.4th 390, 417 . . . .)" (*People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009.) "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. See *Cuyler v. Sullivan*,

58

*supra*, 446 U.S., at 346, 90 S.Ct., at 1717." (*Strickland*, *supra*, 466 U.S. at p. 688.) " 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]" ' (*People v. Cox* (1991) 53 Cal.3d 618, 653 . . . .)" (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)

"In *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), defense counsel had objected that he could not adequately represent the divergent interests of three codefendants. *Id*., at 478–480, 98 S.Ct. 1173. Without inquiry, the trial court had denied counsel's motions for the appointment of separate counsel . . . " (*Mickens v. Taylor* (2002) 535 U.S. 162, 167 [122 S.Ct. 1237] (*Mickens*).) In *Holloway*, the court confirmed that "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." (*Holloway v. Arkansas* (1978) 435 U.S. 475, 488 [98 S.Ct. 1173].) But *Holloway* also recognized that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel." (*Id*. at p. 482.)

"In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel. Neither counsel nor anyone else objected to the multiple representation, and counsel's opening argument at Sullivan's trial suggested that the interests of the defendants were aligned. *Id*., at 347-348, 100 S.Ct. 1708." (*Mickens*, *supra*, 535 U.S. at p. 168.) "[The U.S. Supreme Court] declined to extend *Holloway*'s automatic reversal rule to this situation and held that, absent objection, a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.' 446 U.S., at 348-349, 100 S.Ct. 1708. In addition to describing the defendant's burden of proof, *Sullivan* addressed separately a trial court's duty to inquire

59

into the propriety of a multiple representation, construing *Holloway* to require inquiry only when 'the trial court knows or reasonably should know that a particular conflict exists,' 446 U.S., at 347, 100 S.Ct. 1708--which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation,' *id*., at 348, 100 S.Ct. 1708." (*Id*. at pp. 168-169, fn. omitted.)

*Cuyler v. Sullivan* (1980) 466 U.S. 335 (100 S.Ct. 1708), held that "the possibility of conflict is insufficient to impugn a criminal conviction." (*Id*. at p. 350.) "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." (*Ibid*.) "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. [Citation.]" (*Ibid*. fn. omitted.)

"[I]n *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), three indigent defendants convicted of distributing obscene materials had their probation revoked for failure to make the requisite $500 monthly payments on their $5,000 fines." (*Mickens*, *supra*, 535 U.S. at p. 169.) They were represented by their employer's lawyer and their employer paid the attorney's fees. (*Ibid*.) "[T]he employer's interest in establishing a favorable equal-protection precedent . . . diverged from the defendants' interest in obtaining leniency or paying lesser fines to avoid imprisonment." (*Ibid*.) The Supreme Court concluded that the trial court had a duty to inquire into the apparent "possibility that counsel was actively representing the conflicting interests of employer and defendants" and remanded for a determination of whether there was an actual conflict of interest. (*Id*. at pp. 169-170.)

In *Mickens*, a capital murder case, the defendant's lead trial counsel was actually the appointed attorney of the alleged murder victim, a juvenile, at the time of the

60

juvenile's death but the potential conflict arising from such successive representation was not disclosed to the trial court, co-counsel, or the defendant. (*Id*. at pp. 164-165.) The same judge had appointed counsel in both cases. (*Id*. at p. 165.)

The Supreme Court held in *Mickens* that "in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known" (*id*. at p. 164), a defendant "must show the conflict of interest adversely affected his counsel's performance."[17] (*Id*. at p. 174.) *Mickens* clarified *Holloway's* holding: "*Holloway* thus creates an automatic reversal rule *only* where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict. *Id*., at 488, 98 S.Ct. 1173 ('[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic')." (*Mickens*, *supra*, 535 U.S. at p. 168, italics added.)

*Mickens* defined an "actual conflict of interest" for purposes of the Sixth Amendment's right to counsel as a conflict of interest that adversely affects defense counsel's performance, not "a mere theoretical division of loyalties." (*Id*. at p. 171, see *id*. at p. 172, fn. 5.) It rejected the "[p]etitioner's proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge

---

[17]    "Under our state Constitution, the right to counsel includes the correlative right to conflict-free representation. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 419.) In *Doolin*, the California Supreme Court "harmonize[d] California conflict of interest jurisprudence with that of the United States Supreme Court and adopt[ed] the standard set out in *Mickens*." (*Id*. at p. 421.) *Doolin* stated that California's "informed speculation standard" had proved "too amorphous to provide meaningful guidance to either the bench or bar." (*Ibid*.) It disapproved *People v. Mroczko* (1983) 35 Cal.3d 86, a case cited by defendant in his opening brief, to the extent it could "be read to hold that attorney conflict claims under the California [C]onstitution are to be analyzed under a standard different from that articulated by the United States Supreme Court." (*Doolin*, *supra*, 45 Cal.4th at p. 421, fn. omitted, see *id*. at p. 421, fn. 22.)

failed to make the *Sullivan*-mandated inquiry . . . ."  (*Id*. at p. 172.)  M*ickens* cautioned that "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect."  (*Id*. at p. 172, fn. 5.)

In *Mickens*, the Supreme Court recognized: "Both *Sullivan* itself [citation] and *Holloway* [citation] stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice.  [Citations.]  Not all attorney conflicts present comparable difficulties."  (*Id*. at p. 175.)  It warned that it was *not* ruling "upon the need for the *Sullivan* prophylaxis [of presumed prejudice] in cases of successive representation" and indicated that it was "an open question" "[w]hether *Sullivan* should be extended to such cases . . . ."  (*Id*. at p. 176.)

2. *Analysis*

Despite P.D. Egar's assertion of a conflict of interest, the trial court found the P.D. was not laboring under an actual conflict of interest.  Defendant challenges that determination, maintaining that the P.D. had a conflict of interest within the meaning of the Sixth and Fourteenth Amendments.[18]  While he acknowledges that the trial court "did not simply ignore defense counsel's stated conflict," it is defendant's contention that "the trial court failed to make a 'searching' inquiry which was 'targeted' at the risks of allowing Mr. Egar to continue as counsel."

Defendant does not cite any post-*Mickens* authority extending the automatic-reversal rule of *Holloway*, applicable where defense counsel objects to concurrent

---

[18]    The People insist that defendant Rios waived any possible conflict of interest by stating that he was comfortable with attorneys Egar and Landis representing him. Defendant's statement was made during the *Marsden* hearing and in response to the court's attempt to understand whether defendant had grievances with current counsel.  He was not asked whether he wished to waive his right to conflict-free counsel at that point and his answer to a different inquiry cannot be reasonably regarded as a knowing and intelligent waiver of that right.  (See generally *People v. Hung Thanh Mai*, *supra*, 57 Cal.4th at pp. 1010-1011.)

representation of multiple defendants, to other asserted conflicts of interest like those in this case. As *Mickens* explained: "*Holloway* presumed . . . that the conflict, 'which [the defendant] and his counsel tried to avoid by timely objections to the joint representation,' *id*., at 490, 98 S.Ct. 1173, undermined the adversarial process. The presumption was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors. *Id*., at 489–490, 98 S.Ct. 1173." (*Mickens*, *supra*, 535 U.S. at p. 168.)

A defense counsel's declaration of an actual conflict of interest is not determinative of its existence. (*People v. Clark* (2011) 52 Cal.4th 856, 984.) "Although the high court has endorsed the view that counsel ' "is in the best position professionally and ethically to determine when a conflict of interest exists," ' it also has recognized that it is the trial court that determines whether counsel's representations regarding a conflict of interest are adequate. (*Holloway v. Arkansas*, *supra*, 435 U.S. at p. 485, 98 S.Ct. 1173.)" (*People v. Clark*, *supra*, 52 Cal.4th at p. 984; see *Holloway*, s*upra*, 435 U.S. at p. 487, fn. omitted [*Holloway*'s holding does not "preclude a trial court from exploring the adequacy of the basis of defense counsel's representations regarding a conflict of interests without improperly requiring disclosure of the confidential communications of the client"].)

Here, Klopfenstein was removed from defendant's case and placed on administrative leave after trial. He was not forced to personally prove at a new trial motion that his performance constituted ineffective assistance, which would have conflicted with his personal interests.[19] (See *U.S. v. Del Muro* (1996) 87 F.3d 1078, 1080 (*per curiam*).)

---

[19] Defendant has not demonstrated that, under the particular circumstances of this case, the vicarious disqualification rule required Klopfenstein's personal conflict of

In addition, although defendant suggests that the P.D. was hamstrung from proving trial counsel acted ineffectively, it is not apparent from the record that there was a significant risk that the P.D.'s post-trial representation of defendant was "materially limited" by the P.D.'s responsibilities to the County or Klopfenstein. (See ABA Model Rules Prof. Conduct, rule 1.7, subd. (a) ["A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer]; see also *City and County of San Francisco v. Cobra Solutions, Inc.*, *supra*, 38 Cal.4th at p. 853 [ABA Model Rules may serve as guidelines unless there is on-point California authority or a conflicting state public policy].) Although the P.D. raised the specter of privacy issues with regard to Klopfenstein's personnel matter in the court below, the P.D. ultimately filed a large part of the new trial motion and his supporting declaration under seal. The record does not indicate that the P.D. withheld any information material to the new trial motion.

Defendant has not shown that any responsibility owed by the P.D. to the County to minimize future liability for employment actions taken by the P.D. against Klopfenstein in fact conflicted with the P.D.'s responsibility to bring a new trial motion if there was evidence that Klopfenstein had provided ineffective assistance. The trial court believed that those interests were aligned. (See *Strickland*, *supra*, 466 U.S. at p. 688 [proper

interest to be imputed to the P.D. Egar and his entire office. (See *In re Charlisse C.* (2008) 45 Cal.4th 145, 161-163 [discussing vicarious disqualification rule and the considerations weighing against applying an automatic, inflexible rule of vicarious disqualification to public law offices].) The asserted conflicts did not arise from simultaneous representation of multiple clients or successive representation of clients with potentially adverse interests. (Cf. *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 854 [City Attorney and his entire office were properly disqualified where City brought action against City Attorney's former client whom he represented when he was in private practice].)

standard for attorney performance].)  Further, although Egar indicated at the hearing on defendant's motion for a new trial that he had conflict based on the County's possible liability for Klopfenstein's alleged ineffective assistance, he did not explain to the trial court (and there is no explanation on appeal) how the County's theoretical exposure to such future liability created an actual conflict of interest in this case, especially since prevailing on the motion for new trial would presumably limit any IAC claim for damages against the County (see Gov. Code, § 815.2 [public employer liable in respondeat superior for torts of employees]).[20]

"In determining the effect of an asserted conflict of interest on counsel's performance, we consider whether ' "the record shows that counsel 'pulled [his or] [her] punches,' i.e., failed to represent defendant as vigorously as [he or] [she] might have had there been no conflict." [Citation.]' [Citation.]  When . . . it is asserted that the conflict leads counsel not to act, we inquire whether there may have been tactical reasons other than the conflict that would explain the omission and whether the omitted action is one that likely would have been taken by unconflicted counsel.  [Citations.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 984, male pronouns added.)

The record does not show that the P.D. "pulled his punches" with respect to presenting evidence of trial counsel's inadequate performance in support of the new trial motion.  Although, as defendant points out, the P.D.'s "new trial motion did not address the prejudice prong of the *Strickland* inquiry" and the trial court denied defendant's new

---

[20]     Moreover, while "the immunity conferred by section 820.2 [discretionary act immunity] does not extend to the acts of a deputy public defender in representing a criminal defendant" (*Barner v. Leeds* (2000) 24 Cal.4th 676, 691), "a deputy public defender's exposure to liability for legal malpractice is circumscribed by the requirement that a defendant in a criminal action must prove his or her actual innocence by a preponderance of the evidence before prevailing on a claim against his or her attorney for negligent representation in the criminal proceeding.  (*Wiley v. County of San Diego*, *supra*, 19 Cal.4th at p. 545 . . . .)" (*Ibid.*)

65

trial motion on that basis, defendant has not shown that this deficiency was related to the P.D.'s asserted conflicts of interest. Rather, on the record before us, the failure to make the necessary showing of *Strickland* prejudice was most reasonably attributable to ample evidence of guilt at trial and the fact that investigation of evidence outside the record was necessary to potentially establish prejudice in a habeas corpus proceeding. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 101, disapproved on another ground in *Doolin*, *supra*, 45 Cal.4th at p. 421 & fn. 22.) We discern no likelihood that conflict-free counsel would have presented an adequate showing of prejudice on the motion for new trial.

Thus, even assuming P.D. Egar labored under possible conflicts of interest, defendant has not established that the asserted conflicts had any adverse effect on the P.D.'s post-trial performance. (See *Mickens*, *supra*, 535 U.S. at pp. 172, fn. 5, 174; *Doolin* , *supra*, 45 Cal.4th at pp. 417-418.) "The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable. Cf. *United States v. Cronic*, 466 U.S., at 662, n. 31, 104 S.Ct. 2039." (*Mickens*, *supra*, 535 U.S. at p. 173.) Defendant has not shown that any attorney representing him post-trial was burdened by "an actual conflict of interest 'that affected counsel's performance--as opposed to a mere theoretical division of loyalties.' (*Mickens*, *supra*, 535 U.S. at p. 171, 122 S.Ct. 1237; *Rundle*, *supra*, 43 Cal.4th at p. 169.)" (*Doolin*, *supra*, 45 Cal.4th at pp. 417-418.)

Our conclusion that defendant has not shown that the conflicts of interest asserted by P.D. Egar impaired the P.D.'s post-trial representation of defendant make it unnecessary to resolve any question of prejudice. We only note that, in *Mickens*, the U.S. Supreme Court did not resolve whether a presumption of prejudice should be applied to conflicts of interest other than those arising from concurrent representation of multiple

66

defendants.[21]  (See *Mickens*, *supra*, 535 U.S. at pp. 173-176.)  The California Supreme Court has gone further, concluding that "*Strickland* provides the appropriate analytic framework for assessing prejudice arising from attorney conflicts of interest outside the context of multiple concurrent representation.  [Citation.]"  (*Doolin*, *supra*, 45 Cal.4th at p. 428; see also *Strickland*, *supra*, 466 U.S. at pp. 687, 694.)

DISPOSITION

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.

---

[21]     In *Mickens*, "[t]he case was presented and argued on the assumption that (absent some exception for failure to inquire) *Sullivan* would be applicable—requiring a showing of defective performance, but *not* requiring in addition (as *Strickland* does in other ineffectiveness-of-counsel cases), a showing of probable effect upon the outcome of trial.  That assumption was not unreasonable in light of the holdings of Courts of Appeals, which have applied *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' [citation]."  (*Mickens*, *supra*, 535 U.S. at p. 174.)  The Supreme Court warned that "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application."  (*Id.* at p. 175.)  It stated:  "The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.  [Citation.] . . . Whether *Sullivan* should be extended to [cases of successive representation] remains, as far as the jurisprudence of this Court is concerned, an open question."  (*Id*. at p. 176.)

Trial Court:                    Monterey County Superior Court

Trial Judge:                    Hon. Pamela Butler

Attorneys for Appellant:        Cliff Gardner,
                                Under Appointment by the
                                Court of Appeal

Attorneys for Respondent:       Kamala D. Harris,
                                Attorney General,
                                Gerald A. Engler,
                                Sr. Assistant Attorney General,
                                Seth K. Schalit and
                                Catherine McBrien,
                                Deputy Attorneys General